# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                    Plaintiff(s),                    **REPORT & RECOMMENDATION**
          v.                                          10-CR-6096

JAMES KENDRICK,

                    Defendant(s).

---

## Preliminary Statement

On July 17, 2012, a federal grand jury returned a Second Superceding Indictment against defendant James Kendrick, which includes Counts for federal firearm and drug related crimes, as well as murder while engaged in a drug crime.   See Second Superceding Indictment (Docket # 268).   By text Order of Judge Charles J. Siragusa dated July 8, 2010, all pre-trial motions have been referred to this Court pursuant to 28 U.S.C. § 636(b)(1)(A)-(B).   (Docket # 17).   Currently pending before the Court is defendant Kendrick's motion to suppress.   (Docket # 25).   The Government has filed papers in opposition to Kendrick's motion. (Docket # 30).   On July 30, 2012, a suppression hearing was held and arguments were heard from the parties' attorneys.   Following the hearing, both parties filed supplemental briefs.   (Docket ## 451, 453).   The following is my Report and Recommendation as to the defendant's motion to suppress.

## Relevant Facts

On October 2, 2009, New York State Trooper Gabriel T. Ryan, made a traffic stop of a Buick Rendezvous automobile on the New York State Thruway near Rotterdam, New York. Using a radar gun, Ryan measured the speed of the vehicle as 81 miles per hour, well in excess of the 65 mile per hour speed limit. See Transcript of July 30, 2012 Proceedings (hereinafter "7/30/12 Tr." or "Tr.") (Docket # 299) at 32-34, 39-40. Ryan pulled out into the traffic lane, engaged his emergency lights, and accelerated to catch up to the speeding vehicle. Soon thereafter, the driver of the Buick pulled the car over to the right shoulder of the Thruway, and Ryan pulled his police car up behind it. Tr. at 37. Ryan testified that he made the stop at 10:03 a.m., at which time he radioed in the stop and gave the dispatcher the license plate information and quickly learned that the car was registered to Jose Troche. Tr. at 66-67.

Trooper Ryan exited his vehicle and approached the Buick on the passenger side of the car. Speaking to the driver, Ryan explained that he had stopped the Buick for speeding and asked the driver for his license and registration. Tr. at 37. The driver complied. Ryan identified the driver as Jose Troche. Trooper Ryan described Troche as "shaking," "looking around," and acting "extremely nervous." Tr. at 38. Ryan testified that while most people are nervous when they are stopped by the police, Troche's

2

behavior was unusual, and even after Ryan told him he was just stopped for speeding he still "didn't calm down at all." Tr. at 39.

Wanting to investigate Troche's behavior further, Ryan asked Troche to step out of the Buick and accompany him to the back of the vehicle so he could ask him some questions. Troche exited the Buick and walked with Ryan to the rear of the vehicle. Trooper Ryan asked Troche "where he was coming from, where he was going." Tr. at 39-40. Troche told Ryan that he had been at his "uncle's house to talk about some situations with his uncle" and that he had spent the night at his uncle's residence. Tr. at 40. Ryan noticed that although Troche indicated he had spent the night at his uncle's house, there did not appear to be any luggage in the Buick. Ryan described Troche as "still extremely nervous," and was suspicious of Troche's explanation of his movements. Tr. at 41.

After speaking with Troche, Ryan decided to ask the passengers of the vehicle "the same questions" because "[i]t seemed like there was a little bit more going on than just staying overnight down at the uncle's house." Tr. at 41. Ryan separately approached James Kendrick and Jeffrey Davis, the two passengers in the Buick and asked them the same questions he had asked Troche. Their answers differed, further raising Trooper Ryan's suspicions. Kendrick and Davis told Ryan that Troche's uncle's first name was Pablo, while Troche identified his uncle's name as Juan. Kendrick

3

and Davis told Ryan that they were driving from Brooklyn, while Troche stated that they were coming from Manhattan. According to Ryan "all three individuals were extremely nervous." Tr. at 70. As Trooper Ryan was conducting his questioning, New York State DEC Officer Matt Gregorian arrived as back-up. Tr. at 43.

At 10:12 a.m. Trooper Ryan received information that Troche's license was valid and he had sufficient information to issue Troche a speeding ticket. Tr. at 68. Nevertheless, Ryan testified that based on his training and experience, he felt that there was something "more going on." Tr. at 70. Ryan again approached Troche, who was standing outside at the rear of the trooper's car. Ryan told Troche that "the stories weren't adding up, that there was three different stories. That it was one evening that they were down there, I got three different answers on what they did that evening." Tr. at 43. After telling Troche that it seemed to him "like something more was going on than them just going from point A and going to point B," Ryan asked Troche for his "consent to search the vehicle." Tr. at 43-44. Troche told Trooper Ryan that he could search his car and agreed to confirm permission by signing a written consent to search form. Tr. at 45. Ryan retrieved the form, and asked Troche to fill in his name and address on the form. Trooper Ryan filled in the vehicle information on the form and both Ryan and Troche signed the form. See Government Exhibit 3. Troche signed the form at 10:24 a.m., 21

4

minutes after Troche's car had been stopped.

After the written consent to search form was signed by Troche, Trooper Ryan began to search the Buick. Tr. at 47. As Ryan searched the front passenger side of the vehicle he "noticed wedged in between the passenger seat and the center console there was a yellow package." Tr. at 48. The package was approximately six inches long and four or five inches thick and wrapped in yellow tape. Ryan secured the package in his trooper car and then went over to Troche and asked him "if he knew what was in the yellow package." Tr. at 49. Troche, who was still standing unrestrained outside his vehicle, told Trooper Ryan that "if he had to guess, he would guess it was either cocaine or heroin." Tr. at 49. According to Ryan, Troche admitted that he was paid $500 to transport the drugs. Trooper Ryan then took Troche, Kendrick, and Davis into custody and placed handcuffs on all three of them. Tr. at 49.

At 10:41 a.m. Trooper Ryan read Kendrick his Miranda rights verbatim off a rights card he carries with him in his pocket. Tr. at 51-52. After advising him of his rights, Ryan asked Kendrick if he understood his rights and Kendrick said he did. Tr. at 52. Ryan then asked Kendrick whether he would speak to law enforcement and Kendrick responded that he wanted to speak to Troche and Davis. When Ryan told Kendrick that was not going to happen, Kendrick asked Ryan "to pass a message to Jose [Troche]" and "tell him to

pull a Javier."  Tr. at 53.[1]

All three individuals were transported to the police station in separate vehicles and once they arrived were kept separate from one another.  Trooper Ryan drove Troche and when he arrived he advised Investigator John Kelly about what had happened during the stop.  Ryan also told Investigator Kelly that he had already advised all three of their Miranda rights.  Kelly decided to try and interview all three of the individuals in custody.  Kelly testified that prior to speaking to Kendrick he advised him of his Miranda rights again by reading them verbatim off a rights card. Tr. at 91.  Kendrick told Kelly that he understood his rights, that he was willing to speak but not to him.  Tr. at 91.  Instead, Kendrick told Kelly "[h]e wanted to speak to a narcotics investigator."  Tr. at 91.  Investigator Kelly described Kendrick's demeanor during the brief interview as "calm."  Tr. at 92.  Kelly then left the interview room and contacted Daniel Kiley, a narcotics investigator with the New York State Police in Albany. Kelly  requested that Kiley come to the station to speak to Kendrick and Kiley agreed to do so and arrived a short time later.

When Investigator Kiley arrived at the station he first met with Trooper Ryan and Investigator Kelly and was briefed on the

---

[1] Trooper Ryan testified he did not understand what Kendrick was talking about, but later asked Troche what Kendrick meant. Troche explained to Ryan that Javier is Troche's brother and had previously "ratted out" Kendrick.  Tr. at 53.

arrests and the status of the investigation.  Tr. at 103.  Kiley
was told that Kendrick had been advised of his <u>Miranda</u> rights.  Tr.
at 104.

Investigator Kiley then met with Kendrick in Investigator
Kelly's office and began to interview him.  Kiley testified that
Kendrick was seated next to a desk and was handcuffed to a bull
ring next to the desk.  Tr. at 108.  Kiley's interview with
Kendrick lasted "[a]pproximately one hour."  Tr. at 104.  During
the interview, Trooper Ryan and Investigator Kelly "were in and out
of that room."  Tr. at 107-108.  Kiley testified that he did not
read Kendrick his <u>Miranda</u> rights.  Tr. at 104.  Instead, Kiley said
to Kendrick, "'I understand you've been <u>Mirandized</u>,'" and explained
to Kendrick that "I was not going to go through that again."  Tr.
at 109.  Kiley testified that during the interview, Kendrick was
"[f]riendly, agreeable.  We had an open conversation about what we
needed to talk about."  Tr. at 105.

Investigator Kiley testified that during the interview
Kendrick never asked to speak to a lawyer, and never said that he
no longer wished to speak to the police.  Tr. at 104.  Kiley stated
he never threatened Kendrick in any way, and never denied any
requests by Kendrick to use the bathroom or to have food or water.
Tr. at 105, 112.  Although Kiley told Kendrick that things "could
potentially" go easier for him if he cooperated with the police,
Kiley did not make any promises to Kendrick, and "explained to him

7

I did not have that authority" with respect to whether his "prosecution would be lighter" if he provided information.  Tr. at 109-110.   After the interview concluded, Kiley did not have any further contact with Kendrick that day.  Tr. at 105.

## Discussion

Kendrick seeks to suppress (1) evidence seized during the traffic stop on October 2, 2009, and (2) the statements he made to law enforcement after he was taken into custody.  See Defendant's Post-Hearing Memorandum of Law (Docket # 451).

Legality of the Traffic Stop: Kendrick does not appear to dispute the legality of the stop of the Buick on October 2nd and, in any event, I conclude that Trooper Ryan's stop was supported by probable cause that the vehicle was speeding.   See, e.g., United States v. Shefler, No. 5:06-CR-448-001, 2009 WL 102819, at *4 (N.D.N.Y. Jan. 13, 2009)(officer had probable cause to stop vehicle for speeding when his observation of excessive speed "was confirmed by his standard police radar equipment").   The gravamen of Kendrick's argument is that while the stop of the car may have been lawful at its inception, the 21 minute delay between the traffic stop and the search of the Buick during which the narcotics were found was unreasonable under the Fourth Amendment.

Kendrick is correct in his assertion that law enforcement can not unreasonably detain occupants of a car stopped solely for

8

purposes of issuing a traffic ticket.   In <u>United States v.</u> <u>Harrison</u>, 606 F.3d 42 (2d Cir. 2010), the Second Circuit summarized the law in this area:

> [E]ven a seizure that is "lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." <u>Illinois v. Caballes</u>, 543 U.S. 405, 407 (2005). As applied to a traffic stop, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." <u>Id.</u> Still, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop ... do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." <u>Arizona v. Johnson,</u> 555 U.S. 323, 333 (2009).

<u>Harrison</u>, 606 F.3d at 45.   In <u>Harrison</u>, as here, the defendant argued that once the officer "had all of the information needed to issue the traffic ticket," he was required to issue the ticket and allow the driver to proceed without further inquiry or delay.   <u>Id.</u> The Second Circuit disagreed, holding:

> When a traffic stop is supported by probable cause, the occupants of the car have no "right to be released the instant the steps to check license, registration, and outstanding warrants, and to write a ticket, had been completed.... [T]he fourth amendment does not require the release of a person arrested on probable cause at the earliest moment that step can be accomplished. What the Constitution requires is that the entire process remain reasonable." <u>United States v. Childs</u>, 277 F.3d 947, 953-54 (7th Cir. 2002) (<em>in banc</em>).

<u>Harrison</u>, 606 F.3d at 45.

What matters then is whether Trooper Ryan's questions to the occupants of the Buick "measurably extend[ed] the duration of the

stop."  Arizona v. Johnson, 555 U.S. 323, 333 (2009).  I conclude
they did not.   First of all, while Harrison involved a delay of
five to six minutes, the court cited with approval cases involving
longer delays.   See United States v. Harrison, 606 F.3d at 45
(citing United States v. Turvin, 517 F.3d 1097, 1103-04 (9th Cir.
2008)(fourteen minute delay to ask questions unrelated to purpose
of stop found reasonable); United States v. Hernandez, 418 F.3d
1206, 1212 n.7 (11th Cir. 2005)("Even if seventeen minutes is some
minutes longer than the norm, we question whether the Fourth
Amendment's prohibition of unreasonable seizures is concerned with
such  trifling  amounts  of  time.")).    Under  the  facts  and
circumstances present here, I find that the 21 minute delay between
the traffic stop for speeding and the search of the Buick was
reasonable.

     But even if a 21 minute time period to issue a traffic ticket
for speeding somehow crosses the line of "reasonableness," the
extension of the traffic stop was justified because during the
period where Trooper Ryan was issuing the ticket he obtained facts
independent from the speeding violation which made the resulting
delay reasonable under the Fourth Amendment.   Indeed, once Ryan
executed the traffic stop, he began to observe conduct and obtain
information from Troche, Kendrick, and Davis which raised suspicion
that, aside from driving at an excessive speed, other "criminal
activity may be afoot."   Terry v. Ohio, 392 U.S. 1, 30 (1968).

10

Suspicious information lawfully obtained during a traffic stop "may provide the officer with reasonable suspicion of criminal conduct that will justify prolonging the stop to permit a reasonable investigation." United States v. Martin, 422 F.3d 597, 602 (7th Cir. 2005).

Here, the occupants' unusually nervous behavior, failure to calm down, and inconsistent stories about their travel all caused Ryan to believe that there "was more going on" than a mere speeding infraction.   The brief delay for Ryan to further investigate his suspicions was reasonable and did not violate Kendrick's Fourth Amendment rights.   See, e.g., United States v. McBride, 635 F.3d 879, 882 (7th Cir. 2011)(visibly nervous demeanor of occupants and conflicting statements about their travel provided reasonable suspicion of criminal activity and thus independent basis of extending a traffic stop); United States v. Branch, 537 F.3d 328, 339 (4th Cir. 2008)(even if thirty minute detention was "beyond the reasonable length a traffic stop," so long as officer possessed reasonable and articulable suspicions of additional criminal activity, the delay to investigate was reasonable); United States v. Givan, 320 F.3d 452, 459 (3d Cir. 2003)(after stopping vehicle for speeding and receiving conflicting stories from driver and the passengers about their travel, trooper "was justified in further extending the stop and asking for consent to search the vehicle"); United States v. Toole, No. 06-CR-6024L, 2008 WL 2323362, at *14

11

(W.D.N.Y. Jan. 11, 2008)(delay necessary to obtain services of narcotic detection canine after completion of traffic stop was reasonable), adopted by No. 06-CR-6024L, 2008 WL 2354959 (W.D.N.Y. June 3, 2008). Accordingly, it is my Report and Recommendation that defendant's motion to suppress evidence of the drugs seized during the October 2, 2009 traffic stop be denied.

Kendrick's Statements: Citing to United States v. Murphy, 703 F.3d 182 (2d Cir. 2012), Kendrick moves to suppress the statement he made to police on the day of his arrest arguing that they were the fruit of "an illegal detention" and the "taint" from that detention had not been purged. Because it is my determination that there was no illegal seizure of Kendrick prior to the search of the Buick and the discovery of the narcotics, the Court need not analyze Murphy's four factor test to determine whether Kendrick's statement had been purged of any illegality. In any event, after Troche admitted to Trooper Ryan that he was paid $500 to transport the drugs found in the Buick, all of the vehicle's occupants were placed in custody. There is no question that Kendrick was subjected to custodial interrogation after being placed into custody, but there is also no question that he was properly advised of his Miranda rights. Kendrick was advised of his rights twice, once at the scene of his arrest by Trooper Ryan and a second time at the police station by Investigator John Kelly. Kendrick told both Ryan and Kelly that he understood his rights and then spoke

12

briefly to each of them.  Eventually, Kendrick gave a statement to Investigator Kiley.   There is no evidence that Kendrick did not understand his rights or that he chose to invoke his rights. Kendrick was not coerced, threatened, or pressured into speaking with law enforcement.   "As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford."   Berghuis v. Thompkins, 560 U.S. 370, 385 (2010).   Under these circumstances, his statements to police were made with full awareness of what he was doing and it was not necessary for Kiley to read Kendrick his Miranda rights a third time before interviewing him.   Id. at 386 ("Police are not required to rewarn suspects from time to time."); see United States v. Cleveland, No. 12-CR-6109G, 2013 WL 4759081, at *10 (W.D.N.Y. Sept. 3, 2013)(failure of police to re-advise defendant of his Miranda rights did not require suppression of statements), adopted by No. 12-CR-6109-FPG, 2013 WL 6440949 (W.D.N.Y. Dec. 9, 2013). Therefore, it is my Report and Recommendation that Kendrick's motion to suppress his statements be denied.

## Conclusion

For the foregoing reasons, it is my Report and Recommendation that defendant's motion to suppress the evidence seized and statements he gave to law enforcement on October 2, 2009 (Docket # 25) be **denied**.

**SO ORDERED.**

_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated: February 3 , 2015
       Rochester, New York

14

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York.[2]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections ... shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b)(2) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**SO ORDERED.**

_____
Jonathan W. Feldman
United States Magistrate Judge

Dated:     February 3, 2015
           Rochester, New York

---

[2]   Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed.  *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).