**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

          Plaintiff(s),

     v.

JAMES KENDRICK,
PABLO PLAZA (DOB 1972),
JANINE PLAZA PIERCE, and
ANGELO CRUZ,

        Defendant(s).

**AMENDED**
**REPORT & RECOMMENDATION**
10-CR-6096

---

### Preliminary Statement

On July 17, 2012, a federal grand jury returned a Second Superceding Indictment against the defendants, which includes Counts for federal firearm and drug related crimes, as well as murder while engaged in a drug crime. See Second Superceding Indictment (Docket # 268). By text Order of Judge Charles J. Siragusa dated July 8, 2010, all pre-trial motions have been referred to this Court pursuant to 28 U.S.C. § 636(b)(1)(A)-(B). (Docket # 17). Currently pending before the Court is the defendants James Kendrick, Pablo Plaza (DOB 1972), Janine Plaza Pierce, and Angelo Cruz's Motion for Sanctions for Loss of Evidence, which was originally filed as part of the defendants' Joint Pre-Trial Omnibus motions. (Docket # 365). The Government has filed papers in opposition to these motions (Docket # 444), and both the Government and the defendants have filed supplemental papers with respect to these motions (Docket ## 449, 588, 598,

608).

## Relevant Facts

The Santos Murder Investigation: On May 17, 1999, the Erie County Sheriff's Office received a radio call to respond to the Cattaraugus Indian Reservation in Collins, New York to investigate a shallow grave discovered at the Pinewoods Ball Field. See Exhibit "B" attached to Docket # 365 (Police Report). When law enforcement officers arrived at the location, they spoke with Sandra Cooper who told the deputies that she "found a grave with a leg sticking out." Cooper showed the deputies a map and directed them to the location of the grave. Id. Deputies went to the location and saw "what looked like a leg sticking partly out of the ground." Id. Because it was after dark, the deputies secured the scene of the grave pending further investigation.

Very early the next morning, law enforcement officials began to process the grave site. See Exhibit "C" attached to Docket # 365 (Supplementary Police Report). Specifically, they "examined the [] object in the dirt" which "appeared to be a knee and lower leg bones of a human body." Id. They "removed some additional dirt from the lower area of the leg bones and uncovered what appeared to be a foot with a fabric sock on it." Id. The police excavated the site and took photos as they worked. Id. Various items of potential evidentiary value were removed from the area of the grave, including clothing items, boots, a Rochester Transit

2

System bus token, and a New York State photo ID card issued in the name of Francisco Santos.  Id.  A body was removed from the grave and taken to the Erie County Medical Examiner for an autopsy.

On May 19, 1999, the Erie County Medical Examiner conducted an autopsy on the body.  See Exhibit "D" attached to Docket # 365. The autopsy revealed that the body had a total of eight stab wounds - two in the front of the body and six in the back of the body. Id.  The autopsy also revealed that "[t]here was a laceration to the back of the right hand between the thumb and index finger." Id.  The victim was formally identified as Francisco Santos and his death was determined to be "caused by multiple stab wounds."  Id.

Law enforcement officials from both Erie County and Monroe County participated in the investigation regarding the Santos murder. On May 28, 1999, police conducted a raid in Rochester that resulted in "[s]everal knives" being found and seized which were submitted to the Monroe County lab for serology testing.  See Exhibit "E" attached to Docket # 365.  On June 2, 1999, a camouflage flak jacket, black trench coat, hair specimens from the black trench coat, white and black bandana, hair specimens from the bandana, felt trunk liner, hair specimens from the felt trunk liner, and scrapings from the car trunk were seized from 80 Isabelle Street in Rochester, New York.  Id.  On July 13, 2009, Sheriff's investigators discovered a shovel they believed was used to dig the grave.  See Exhibit "G" attached to Docket # 365.  The

wooden handle of the shovel was broken and there was soil residue on the blade of the shovel.  Id.   During the course of their investigation, police also seized a glass liquor bottle from a location on Murray Street on August 3, 1999, a serrated steak-knife blade found buried in the area of the shallow grave on June 8, 2000, and seven steak knives seized from David Pierce's home in Collins, New York on June 20, 2000.  See Exhibits "H," "I," and "J" attached to Docket # 365.

With the exception of the clothing found at the Santos grave site, all of the physical evidence seized during the course of the police investigation was received by the Erie County Sheriff's Office and logged into its property room for safekeeping.   The soiled clothing retrieved from the grave site was discarded by the Erie County Medical Examiner's office after completion of the autopsy on Santos's body.

No state prosecution against the defendants for the murder of Francisco Santos was ever commenced.  In 2010, however, the federal grand jury charged the defendants with violating federal criminal statutes relating to narcotics distribution.   Count 14 of the Second Superceding Indictment alleges that while engaging in a conspiracy to distribute cocaine, crack cocaine, and heroin, the defendants intentionally killed and caused the intentional killing

4

of Francisco Santos in violation of 21 U.S.C. § 848(e)(1)(A). <u>See</u>
Second Superseding Indictment (Docket # 268).[1]

During discovery, defense counsel sought to examine the
physical evidence related to the Santos murder. By letter dated
October 5, 2012, AUSA Rodriguez advised defense counsel that the
Government had "checked with the Erie County Sheriff's Office and
have been advised that they are unable to find any of the physical
evidence from the Francisco Santos murder investigation." <u>See</u>
Exhibit "A" attached to Docket # 365. In written pretrial motions
defense counsel sought dismissal of Count 14 on grounds that the
deliberate destruction or spoliation of material evidence violated
the defendants' due process rights. After oral argument of the
defendants' initial motions, this Court ordered an evidentiary
hearing to determine the facts and circumstances surrounding the
loss and destruction of evidence.

<u>The Evidentiary Hearing</u>: On April 2, 2014, the Court conducted
an evidentiary hearing. <u>See</u> 4/2/2014 Transcript of Proceedings
(hereinafter "Tr.") (Docket # 574). At the hearing, the Government
presented testimony regarding two sources of evidence that was no
longer available to the defense: (1) evidence that was stored and
maintained by the Erie County Sheriff's Office; ("ECSO") and (2)

---

[1] The Santos murder was originally charged as a capital offense in
the first Superceding Indictment. <u>See</u> Docket # 38. By letter
dated January 24, 2013, Attorney General Eric Holder notified all
counsel that the Santos murder would not be authorized as a death
penalty prosecution.

evidence that was stored and maintained by the Rochester Police Department ("RPD").

(A) Erie County Evidence: Two retired members of the Erie County Sheriff's Office testified at the hearing about their role in gathering and destroying evidence relating to the Santos murder, and a current Erie County Sheriff's Office Deputy testified regarding the searches he conducted of the property room to look for any items related to the Santos case.

1. Lieutenant Thomas Rich: At the time of the Santos murder investigation Lt. Rich wore several "hats" for the ECSO: (1) Chief Officer of the Bureau of Investigation; (2) the custodian of the fingerprint files; (3) the principal crime scene photographer for the Department; and (4) a crime scene investigator responsible for gathering, examining, and storing evidence. Tr. at 37. Rich testified that on the evening of May 17, 1999 he was off duty and received a phone call at his home to report to work to investigate the apparent discovery of a dead body. Tr. at 12. Rich drove from his home to the Cattaraugus Indian Reservation in the southern part of Erie County. Rich was directed to "an old athletic field type area on the reservation." Tr. at 13. When he arrived at approximately 2:00 a.m. on May 18th, other police officers and marked patrol cars were present. Tr. at 13. Rich was briefed on the situation by Captain Hedges, who told him that there was "a bone of some type buried just at the surface of the ground," and

6

the officers had been waiting for Rich to arrive to "make a determination if it was either human or animal." Tr. at 13-14. Rich proceeded to clear some of the dirt around the bone and he "observed that there was a sweat sock at the end of the bone," so "it was determined to be human." Tr. at 14. Rich decided to wait until sunrise before starting any excavation of the bone. Tr. at 14. Sergeant Vince Pupo took photographs of the scene and of the bones sticking out of the ground. Tr. at 33-34.

After sunrise on the morning of the 18th, Rich and Sergeant Kenyan began the digging process, which was again photographed by Sergeant Pupo. Tr. at 14, 34. The officers soon "discovered that there was a human body buried beneath the surface." Tr. at 14. To exhume the body, Rich and Kenyan "used hand tools and hand trowels and little hand rake type thing and an old Army entrenching tool that was used to dig fox holes." Tr. at 84. The body was removed from the ground and the medical examiner's office was notified. Tr. at 15. Rich testified that "[t]he body was covered with dirt and debris and a thick waxy coating adhered to the body and the clothing." Tr. at 15. Rich recalled that "[w]hen the body was removed, it was quite heavy because of this material adhering to the body." Tr. at 15. Rich stated that he later learned from the medical examiner that human remains buried in an "unprotected" way "leach fat from the interior of the body outside of the skin and cause this waxy substance" which impregnates the clothing on the

7

body.  Tr. at 16.  Rich examined the clothing at the scene, and
testified that the pair of jeans that was on top of the body was
"saturated" with this waxy substance.  Tr. at 16-17.  According to
Rich, the body was clothed in a plaid shirt and blue shorts.  Tr.
at 51.

During the investigation at the grave site, Rich found and
gathered other evidence including a pair of sunglasses that were
found hanging on a nearby tree and three spent shotgun casings.
Tr. at 39.  A New York State identification card issued to
Francisco Santos was also found laying on top of the body, and an
RTS token was found loose in the pants pocket of the jeans.  Tr. at
44.  Rich found that the body was buried in "clay soil," which was
"a very hard soil with rocks embedded in the clay."  Tr. at 40.
Rich testified that "[b]ecause of the position of the body at the
time it was recovered within the grave itself, it appeared that the
body was buried on an angle with the upper part [of] the head and
shoulders at a deeper - at a depth below the surface level; and the
feet and lower legs were at a higher level closer to the surface."
Tr. at 41.

According to Rich, members of the Erie County Medical
Examiner's ("ME") Office responded to the grave site to secure the
remains and then transport the body to the ME's office for autopsy.
The autopsy took place the following day, on May 19th.  Tr. at 15.
Photographs were taken as the autopsy progressed.  Tr. at 35.  The

8

clothes that were on the body were photographed at the grave site and then sent with the body to the ME's office.  Tr. at 15, 35. Rich testified that he did not retrieve the clothing or footwear from the ME for storage or analysis "[b]ecause of the body fluid saturated within the clothing and the condition of them, the clothing, was deteriorating along with the decomposition of the body, there was a biohazard consideration, [so] it was not retained" and "was left at the medical examiner's office, presumably for destruction." Tr. at 16-17.  Rich testified that he does not recall having any discussion with the ME about discarding the clothing, but stated that "[i]t would have been my decision [to discard the clothing] at that time." Tr. at 17.

Rich explained that it would have been his "normal practice" to retain the clothing "[f]or trace evidence and storage" and ordinarily it "would be dried and then packaged for storage." Tr. at 18.  But he made the decision to handle the Santos clothing differently because of the "waxy substance" which Rich believed was a "biohazard." Tr. at 18.  Rich explained that the clothing and boots were "saturated with bio fluids and this waxy substance and the clothing was pretty much contaminated." Tr. at 18.  Rich did not dispute that murder victims and victims of other violent crimes often have blood and other fluids on their clothing and, ordinarily, items of clothing  from crime victims are not discarded.  Tr. at 18-19.  However, he believed this case was

9

different "[b]ecause of the amount of saturation" and the way
"[t]he fabric was encased in this waxy substance and there was
material, dirt and vegetation adhering to it, and it was totally
contaminated from being underground for so many months and it would
not offer anything of DNA value." Tr. at 19. Rich testified that
he did not do any scrapings or tests on the clothes or boots prior
to them being transported to the ME's office. Rich testified that
he did not consider the possibility that DNA evidence might be able
to be retrieved from the clothing and, therefore, did not
contemplate taking the clothing or boots back to the Erie County
property clerk's office. Tr. at 17. According to Rich, once the
items were sent to the ME's office, he was unable to perform any
such tests because he no longer had custody of the items. Tr. at
43.

In explaining why he thought the victim's clothing was
biohazard material, Rich noted that the autopsy took place "in a
specific special room they use for decomposition" which "had
increased exhaust systems, and you had to gown and double glove and
things because of the contamination of the body and the clothing."
Tr. at 20. Rich recalled asking the ME personnel "why the body was
being examined in this specific room," and was told that "it was
the room that they reserved for contagious biohazard material or
examinations." Tr. at 53. Rich testified that as a result of all
of these factors, and after considering that the body was "in a

10

progressed decomposed condition," he decided not to retain the clothing.   Tr. at 20.

Rich stated that it was never his intention to "somehow deprive anyone of their constitutional rights to examine evidence collected," nor was it his intent to "conceal possible exculpatory evidence," by not taking the clothing and the boots back to the Eric County property clerk's office for possible further analysis. Tr. at 20-21.   Rich testified that if he thought the clothing or boots could have provided evidence as to the identity of the suspects, he would not have discarded the items.   Tr. at 21.

Rich also testified about the recovery of a knife.   In June 2000 the ongoing police investigation developed information that a knife blade "may have been left at the scene" after the body was exhumed.   Tr. at 26.   Upon learning this, on June 8, 2000, Rich and other investigators "returned to the area where the body was removed and we had a backhoe excavate the area and the area was checked with a metal detector in trying to locate a knife."   Tr. at 26.   A knife blade was found and was photographed as it was found in the bucket of the backhoe.

Rich examined the knife for fingerprints.   Tr. at 27.   Rich testified that he found no visible fingerprints on the blade.[2]   Tr.

---

[2] Rich testified that he had attended FBI fingerprint training programs, including basic fingerprint identification, advanced fingerprint identification, and advanced administrative latent print training.   Tr. at 27-28.

at 27. After visually examining the blade, Rich packaged it up and sent the blade "to the Central Police Services Laboratory for examination of residue on the knife blade." Tr. at 28. Rich testified the Central Police Services ("CPS") Laboratory would test the blade for "DNA, blood evidence, trace evidence, et cetera." Tr. at 28. The CPS Laboratory subsequently conducted a forensic analysis of the blade and concluded that there were no "significant trace or serological materials" on the knife blade. Tr. at 29.

In addition to the visual fingerprint analysis he conducted at the scene, Rich stated he also personally conducted a fingerprint analysis on the blade at his laboratory in Chestnut Ridge Park using ultraviolet rays and other enhanced lighting. Tr. at 30. Rich testified that he did not utilize fingerprint powder on the blade, did not perform a cyanoacrylate ester analysis or put any other substance or chemical on the blade itself. Tr. at 30-31. According to Rich, he made the "investigative decision" not to put anything on the knife blade before having it tested for DNA and blood samples because he "did not want to compromise any material that may have been adhering to the blade itself." Tr. at 31.

Once Rich received the blade back from the CPS Laboratory, he filled out a property receipt for the knife blade and deposited it with the property clerk's office. Tr. at 32. The property receipt for the knife was the subject of testimony at the hearing because the receipt did not contain a date listing when it was logged into

the property room.   Rich acknowledged that the date should have been listed on the receipt and he did not know why he did not fill it out properly.   Tr. at 60-61.   Because the receipt did not contain a date, Rich could not state with certainty the date that he deposited the blade at the property room but believed it was sometime during the year 2000 because that is when he received the blade back from the CPS Lab.   Tr. at 60-61.   The property receipt for the knife blade was also missing the signature of the property room clerk who received the evidence.   Rich explained that this was probably because no one was on duty at the property room when he dropped off the blade, and he likely locked it into the storage room lock box to be retrieved when a property clerk was back on duty.   Tr. at 62.   Rich explained that this happened from time to time   and   that   on   those   occasions   he   "would   normally   take   a photocopy of the receipt before I submitted it."   Tr. at 63.   Rich conceded, however, for chain of custody purposes, the bottom part of   the   form   where   the   words   "received by"   are   shown   should   be completed when the property room clerk receives the evidence.   Tr. at   63-64.   Moreover,   the   original   form   should   also   state   the specific   name of the individual who actually received the item of evidence.   Tr. at 63-64.   Once he left the knife blade with the Property Clerk,   Rich stated he does not recall ever going back to the property room again to look at the blade.   Tr. at 60.

13

With respect to a shovel that was found, Rich testified that he did not find or collect it and did not see it at the burial site.  Tr. at 82.  Rich testified that another detective found the shovel at a location other than the grave site and submitted it to Rich to be sent to the FBI for testing.  Rich testified that he sent the shovel along with soil samples from the grave site to the FBI "for a soil sample comparison."  Tr. at 66.  Rich described the shovel as having a "broken handle" and a "rough wood shaft" with a blade that "was fairly rusty and soiled."  Tr. at 66.

    2.  Erie County Property Clerk[3]:  The retired Erie County Sheriff's Office employee who worked as the Sheriff's Office Property Clerk also testified at the hearing.  This Property Clerk worked for the Erie County Sheriff's Office for approximately thirty years, from approximately 1997 through 2003.  Tr. at 86-87. According to the Property Clerk, his responsibilities included "[m]aintaining the evidence, logging it into the property room and keeping it secure until whomever wanted it."  Tr. at 87.   The Property Clerk explained that whenever evidence was removed from the property room it had to be "signed for."  Tr. at 89.

    The Property Clerk's testimony centered on his description of the procedures he used in deciding if and when to dispose, abandon, or destroy evidence maintained in the property room.  According to

---

[3] Because the Property Clerk is no longer a public employee, and has been retired from Erie County for over a decade, this Report and Recommendation will refer to him as the Property Clerk.

the Property Clerk, the property room was "very small" and "we had to constantly eliminate" evidence from the room. Tr. at 90. The Property Clerk testified that "the amount of physical space in the [property] room" required him to periodically survey the evidence in the property room in order to decide what evidence to dispose of or abandon. Tr. at 101. Put simply, when the Property Clerk was "running out of space" to store evidence he would decide what evidence to dispose of. Tr. at 101. The Property Clerk testified that once he determined what evidence would be removed from the property room, the "past practice" of the Sheriff's Office was to give it to an auction company. Tr. at 89. The auctioneer "would come in a truck and take anything that we wanted to get rid of, and if it was of value, they would auction it off. If it was of no value, they would throw it away." Tr. at 89. The Property Clerk stated that from time to time evidence was auctioned off because "[s]ometimes if the statute of limitations were over, I would ask the captain and he would approve for me to get rid of something." Tr. at 102-103. The Property Clerk further explained that "sometimes if I looked at something and it's been on there for a long time, I would dispose of it ... depending on its age, I would get rid of it just for the fact that it's been there for fifteen years." Tr. at 104. The Property Clerk testified that he had the discretion to dispose of items in the property room without consulting with a supervisor. Tr. at 107.

15

The Property Clerk testified that on April 16, 2002, he approved sending to auction all of the physical evidence in the Santos murder case that was stored in the property room. Tr. at 93-94. The Property Clerk did not review what specifically in the Santos file was being disposed of as it was the "practice" for "everything" in a case to be sent off to auction once a determination had been made to dispose of evidence on that case. Tr. at 95. The Property Clerk himself did not discard any items of evidence, rather he followed past practice and requested that the auctioneer come and pick up evidence to be discarded, which included the Santos evidence. Tr. at 95. The Property Clerk explained that the auctioneer would decide whether items were sold or discarded. Tr. at 95.

The Property Clerk readily admitted that evidence in an open homicide investigation should never have been sent to auction. Tr. at 96. While he had no specific recollection of the evidence he was maintaining in the Santos case, he surmised that he must not have realized that Santos was a homicide case. Tr. at 90. According to the Property Clerk, if he had realized the property he was discarding was related to a murder investigation, he never would have released the evidence for auction. Tr. at 90. The Property Clerk repeatedly described his actions as a "mistake." The Property Clerk testified that every item of property is assigned a "lot number" which corresponds to the number on the

16

property receipt. Tr. at 96. The property receipt form requires a case type designation. The words "homicide" or "murder" are clearly written at the top of the relevant receipt forms for the Santos property. See Hearing Exhibits "5" and "6." The Property Clerk stated that every property receipt for evidence in the storage room is physically bound together by a clip located at the top of the receipts. Tr. at 91. Because there were so many receipts, it was "difficult" to lift each page so as to be able to read what is written at the top of the form "without pulling apart the book" of forms. Tr. at 91. Asked directly to "recall any steps you took before making that decision to give it to the auctioneer," the Property Clerk responded:

> I didn't really, it was given to him by mistake. I needed shelf space. I looked at the [property] bags to see if [] there was anything of value in there, that I thought was of any value, and I mistakenly gave them away without looking at the top of the thing [receipt form] and seeing it was for a homicide investigation.

Tr. at 108-109.

The Property Clerk also testified that in deciding whether stored evidence related to an open or closed case, he also "could look it up on the computer." Tr. at 110. When asked by the Court "how could you make a mistake like not looking it up on the computer?", the Property Clerk replied:

> I can give you that going through this when I'm looking for things, I can get rid of boxes from DWI, old things I know are trespassing cases. In the process of doing that I could have misread the number. I could have done that, could have flipped back on me and I went back and

17

removed that stuff and removed by mistake.    It never
should have gone.  I can't tell you exactly how I did it,
but I know I made a mistake and pulled it off the shelf
and got rid of it.

Tr. at 111.  The Property Clerk admitted that he did not check with

a supervisor, the District Attorney's Office, the United States

Attorney's Office, or anyone else before discarding the Santos

evidence stored in the property room.  Tr. at 119-120.  Indeed, he

did not realize his error until years later when he was contacted

by the United States Attorney's Office about the missing evidence.

Tr. at 120.  However, the Property Clerk insisted that in allowing

the Santos evidence to be released for auction, he never "intended

to conceal or hide any exculpatory material" or "to somehow

undermine a murder investigation or the ability" of any of the

defendants to defend themselves against one.  Tr. at 97.

   3. Sheriff Deputy Shawn Young: Deputy Young testified that he

is currently employed by the Erie County Sheriff's Office and, for

about three years starting in December 2010, was "essentially the

property clerk."  Tr. at 130.  Young testified that sometime in the

Fall of 2012 he was asked by Captain Kenyan to check the property

clerk's office to see whether there was any property relating to

the Santos homicide investigation.  Tr. at 130, 140.  Young "looked

through our entire property room checking under the shelves and

around all of the boxes and pieces of evidence" and did not find

any items relating to the Santos murder investigation.  Tr. at 131.

Young testified that on two occasions he physically searched the

18

entire property room looking for any items related to the Santos case, but did not locate anything. Tr. at 131-133.

(B) Rochester Police Department Evidence: The Manager of Police Property for the Rochester Police Department ("RPD") testified about her role in storing and destroying evidence relating to the Santos murder investigation.

4. Kathleen Katerle: Kathleen Katerle testified that she is the Manager of Police Property for the RPD and manages the property clerk's office. Tr. at 143. As property clerk manager, Katerle testified that she is responsible for making sure evidence is properly secured and safely stored. Her responsibilities also include ensuring that any evidence which is purged, destroyed, or released to auction is done pursuant to Court Order or other destruction of evidence protocols. Tr. at 143.

Katerle testified both generally about drug destruction orders and evidence disposal protocols the RPD utilizes and, more specifically, about how those protocols were applied with respect to evidence relevant to this federal prosecution. To assist the Court, Katerle and the Government prepared a spreadsheet (see Hearing Exhibit "10") setting forth the case number, status, and disposal of each piece of evidence or property maintained by the RPD relevant to this federal prosecution. As to narcotics, Katerle confirmed that the RPD received three drug destruction orders with respect to narcotics relevant to this prosecution: (1) a November

14, 2005 Order signed by the Hon. Alexander Renzi (Hearing Exhibit
"11"); (2) a November 3, 2006 Order signed by the Hon. Elma Bellini
(Hearing Exhibit "12"); and, (3) a January 8, 2007 Order signed by
the Hon. Richard Keenan (Hearing Exhibit "13").   Tr. at 147-149.
Attached to these orders were receipts which identified the various
case numbers that drugs were to be destroyed from.   Tr. at 148.
Katerle testified that for each of these drug destruction orders
there were also receipts provided to the issuing judges which
confirmed that the drugs had in fact been destroyed.   Tr. at 151.
Katerle confirmed that all of the drugs relevant to this federal
prosecution were destroyed only after receiving judicial approval.

     Katerle also testified about the non-drug evidence that was
destroyed.   As set forth on Hearing Exhibit "10," each item of
evidence was disposed of, destroyed, auctioned, or returned to its
owner consistent with established RPD protocols applicable to the
type of evidence and the nature of the crime.   According to
Katerle, the following types of non-drug evidence related to this
federal prosecution was destroyed: (1) audio tapes of undercover
narcotics transactions, (2) various items seized during a search of
12 Phelps Avenue, and (3) guns, ammunition, and three knives.   Tr.
at 157-158.   Katerle explained that the process for destroying non-
drug items required consultation with and approval from the
District Attorney's Office, which would advise her which evidence
could be destroyed and which evidence needed to be preserved.   Tr.

at 159.   The destruction of handguns involves additional steps including obtaining New York State Police permission to destroy the weapon.   Tr. at 159.

Katerle testified that all of the items listed on Hearing Exhibit "10" were disposed of pursuant to Court Order, approval of the Monroe County District Attorney's Office, or pursuant to established evidence handling protocols and procedures.   Cross-examination by defense counsel did not reveal any material irregularities or inaccuracies in the information recorded in Hearing Exhibit "10."

## Discussion

The Government's Due Process Obligation to Preserve Evidence: It is beyond cavil that a criminal defendant's due process rights include the right to review all evidence the government possesses that "is material either to guilt or to punishment."   Brady v. Maryland, 373 U.S. 83, 87 (1963).   It is equally clear that "this right would be empty if the government could trump it by the simple expedient of destroying evidence harmful to its theory of the case."   Magraw v. Roden, 743 F.3d 1, 7 (1st Cir. 2014).

In defining the parameters of the government's due process obligation to preserve material evidence, the Supreme Court has distinguished situations where (1) the exculpatory value of the evidence was apparent to law enforcement before the evidence was

21

destroyed and (2) situations where the evidentiary value of destroyed or missing evidence was not known and can be described only as potentially exculpatory.  In the first instance, where the materiality of the evidence was apparent to the police at the time the evidence was destroyed, "good or bad faith of the prosecution is irrelevant."  Illinois v. Fisher, 540 U.S. 544, 547 (2004); see California v. Trombetta, 467 U.S. 479, 485 (1984).  However, where the evidence at issue can only be described as "potentially useful," the defendant must demonstrate the police acted in bad faith in order to prove a due process violation.  Illinois v. Fisher, 540 U.S. at 548 (quoting Arizona v. Youngblood, 488 U.S. 51, 58 (1988)).  See generally Olszewski v. Spencer, 466 F.3d 47, 56 (1st Cir. 2006)(under Youngblood, defendants must meet bad faith standard where the evidence at issue is not "apparently exculpatory" but only "potentially useful" to the defense).

Here, the defendants concede that the evidence at issue was only "potentially exculpatory."  In other words, defense counsel agrees that the best that can be said of the unpreserved or destroyed evidence in the Santos murder investigation is that had the evidence been preserved and subjected to testing, the results of the testing "may" have been useful to the defense.  See Defendant's Joint Memorandum of Law (Docket # 588) at p. 10.  As a result, the defendants agree that to demonstrate a due process violation, they bear the burden of proving the bad faith

22

requirement as required by the Supreme Court in Youngblood.  Id. at pp. 10-11.

The facts and legal analysis of Youngblood are instructive. The defendant in Youngblood was charged with molesting and sodomizing a child.  The victim was taken to a hospital where semen samples were obtained from both the child and a stain on the child's underwear.  The police failed to properly preserve the samples.  At trial the defense called an expert who testified as to what might have been shown had the samples been properly preserved for forensic testing.  The defendant was convicted at trial, but the Arizona Court of Appeals reversed the conviction, concluding that based on the testimony of the defense expert "timely performance of tests with properly preserved semen samples could have produced results that might have completely exonerated" the defendant.  488 U.S. at 55.  The Supreme Court granted certiorari "to consider the extent to which the Due Process Clause of the Fourteenth Amendment requires the State to preserve evidentiary material that might be useful to" the defense.  Id. at 52.

In reversing the judgment of the Arizona Court of Appeals, the Supreme Court distinguished its due process analysis under Brady where the good or bad faith of the government in failing to disclose material exculpatory evidence is irrelevant.  "[W]e think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of

which no more can be said than it could have been subjected to tests, the results of which might have exonerated the defendant." Id. at 57.   In these circumstances, the Court held, the defendant is required to prove that the police acted in bad faith.   The Court gave two reasons for requiring a showing of bad faith.   First, the Court was concerned about judges being assigned "the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed."   Id. at 58.   Second, the Court was unwilling to define the "fundamental fairness" requirement of due process to encompass "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution."   Id. Assigning the defendant the task of showing "bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant."   Id. (emphasis added).

    Based on federal cases decided subsequent to Youngblood, there is little dispute that the evidentiary burden placed on the defendant is uncompromising and difficult to meet absent direct proof of intentional conduct by law enforcement.   Indeed, as the Court noted in Youngblood: "The presence or absence of bad faith by

24

the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." 488 U.S. at 56 n.*. Some courts have described the defense burden as demonstrating law enforcement animus or a deliberate and conscious effort to suppress exculpatory evidence. See United States v. Jobson, 102 F.3d 214, 218 (6th Cir. 1996)("To establish bad faith, then, a defendant must prove 'official animus' or a 'conscious effort to suppress exculpatory evidence.'")(citation omitted); Ewing v. Zavislak, No. 97-2021, 1998 WL 964238, at *1 (6th Cir. Dec. 30, 1998)(stating that "[b]ad faith cannot be established unless the plaintiff proves a 'conscious effort to suppress exculpatory evidence' on the part of the police")(citations omitted); Woodson v. Sec'y, Dep't of Corrs., No. 6:10-cv-649-Orl-36KRS, 2012 WL 5199614, at *7 (M.D. Fla. Oct. 22, 2012)("Petitioner must show more than intentional destruction of potentially exculpatory evidence; Petitioner must demonstrate that the State was aware of the exculpatory value of the evidence and made a conscious effort to prevent the defense from securing the evidence."); United States v. Sanders, 207 F. App'x 651, 653 (7th Cir. 2006)("[B]ad faith means a conscious effort to suppress exculpatory evidence.")(quotation marks and citations omitted). Moreover, courts applying Youngblood have held that negligent or even grossly negligent conduct by the police in failing to preserve

potentially exculpatory evidence does not qualify as bad faith. See, e.g., United States v. Branch, 537 F.3d 582, 590 (6th Cir. 2008)(although failure to preserve videotape "may have been negligent, or even grossly negligent, as the district court found, it was not in bad faith"); Monzo v. Edwards, 281 F.3d 568, 580 (6th Cir. 2002)("When the government is negligent, or even grossly negligent, in failing to preserve potentially exculpatory evidence, bad faith is not established."); Boykin v. Leapley, 28 F.3d 788, 793 (8th Cir. 1994)("It is clear that although the state did act negligently [in failing to preserve blood samples], it did not act in bad faith."); United States v. Fairchild, 24 F.3d 250, 1994 WL 161949 (9th Cir. 1994)(police incompetence is not bad faith); United States v. Eldridge, No. 09-CR-329-A, 2014 WL 4829146, at *6 (W.D.N.Y. Sept. 29, 2014)(government's conduct in releasing potentially exculpatory evidence did not constitute "negligence of gross magnitude necessary for a finding of bad faith"). With this exacting standard in mind, the Court turns to whether the defense has met its burden here of proving bad faith.

Bad Faith: For purposes of this Report and Recommendation, the Court will assume without deciding that the evidence at issue here was "potentially exculpatory" within the meaning of Youngblood.[4] Nevertheless, for the reasons set forth below, the

---

[4] The Government argues that the defense has failed to prove that the missing evidence was even potentially exculpatory. The Government has a point. The only substantive reference to the exculpatory value of the evidence is found in the defense's opening

Court finds that the defense has failed to present evidence upon which the Court could find that law enforcement acted in bad faith.

Evidence Discarded by Medical Examiner's Office:  In terms of bad faith, the Court need not tarry long to conclude that the decision of Lieutenant Rich to leave the victim's clothing and shoes at the medical examiner's office after the autopsy was completed did not amount to a due process violation.  Rich testified that the clothing and boots were encased with dirt and debris.  Moreover, the victim's body had started decomposing and had leached body fat.  A thick wax-like substance had saturated both the boots and clothes.  Rich testified he normally would retain clothing from a murder victim for "trace evidence and storage" but in this case he believed the clothing and boots were "totally contaminated" with body fluids that had leached from the victim's decomposing body and constituted a biohazard.  Rich

post-hearing brief. According to the defense, the items at issue "were apparently of exculpatory value because they were capable of being tested for fingerprints, DNA evidence, and subject to other forensic analysis." Defendants' Joint Memorandum (Docket # 588) at p. 6. Whatever burden the defense bears, it probably is more than simply hypothesizing that because items seized by law enforcement were "capable of being tested" the Court can easily conclude that the items were "apparently" of potential exculpatory value. Indeed, the Supreme Court's Youngblood decision was premised in large part on the testimony of an expert called by the defense who testified as to what might have been shown had the semen samples been properly preserved for forensic testing. Here, the exculpatory value of DNA, fingerprint or other forensic testing of the items at issue was not self-evident, at least to this Judge. Despite ample opportunity to present expert testimony on how and why forensic testing of the evidence at issue here could yield data that had exculpatory value, the defense chose not to do so.

27

testified that the autopsy itself was conducted by the medical examiner in a special room used for corpses that had begun decomposing. This room utilized an increased exhaust system and required those present to wear a gown and "double glove" because of the danger of contamination. Upon consideration of these circumstances, Rich made the decision to leave the clothing and boots with the medical examiner for disposal. On this record, there is simply nothing for this Court to base a finding that Lieutenant Rich's decision was in any way motivated by some sort of official animus or made with "knowledge of the exculpatory value of the evidence" that was being discarded. Youngblood, 488 U.S. at 56 n.*. Indeed, based on the evidence presented at the hearing, I conclude that Rich's decision was motivated solely by his view that preserving clothing and boots that had been impregnated with leaching body fluids and fat from a decomposing human body that had been buried unprotected in the ground for seven months presented a biohazard. Whether Rich's view was right or wrong is not the issue. What can be said is that there is no basis for the Court to conclude his decision to leave the clothing and boots with the medical examiner for safe disposal was made in bad faith. See, e.g., United States v. Red Bow, 851 F. Supp. 2d 1176, 1182 (D.N.D. 2012)(Even if "it was arguably negligent to have failed to retain" blood stained clothing, "it is well-established that mere negligence does not equate with bad faith and a resulting due

process violation.").

Evidence Discarded by the Erie County Property Clerk: The hearing testimony about evidence disposed of by the Erie County Property Clerk was far more troubling, but ultimately yields the same due process conclusion.   Nevertheless, the Court begins its analysis with a finding that the lack of care taken by the now retired Erie County Sheriff's Office Property Clerk over the Santos murder investigation evidence was nothing short of astonishing.  No matter the vantage point, there is simply no rational excuse or coherent explanation for mindlessly releasing for auction evidence relevant to an unsolved murder investigation simply because the evidence room was getting too crowded.   That the decision to discard was made by a public employee whose primary job responsibility was to maintain a secure storage room so that relevant evidence needed by law enforcement would be available for later use and analysis was even more remarkable.   The Property Clerk's candor in readily admitting his "mistake" made his testimony more credible but no less disturbing.   Indeed, in the context of this motion, the Government makes no effort to soften its appraisal of the Property Clerk's conduct, describing it as "negligent and perhaps grossly negligent."  Government's Memorandum of Law (Docket # 598) at p. 10.

Of course, the Government's criticism of the Property Clerk's decision to discard the Santos evidence is made with full knowledge

that the defendant's burden in proving bad faith is far more onerous than simply proving negligent failure to preserve potentially exculpatory evidence. See, e.g., Cencich v. Miller-Stout, No. 10-5164 BHS/KLS, 2012 WL 4411864, at *9 (W.D. Wash. Sept. 6, 2012)("Even if the failure to retain evidence was an intentional act, that fact alone does not demonstrate bad faith."); Morgan v. Palmer, No. 2:11-cv-10265, 2012 WL 1806154, at *4 (E.D. Mich. May 17, 2012)("The mere fact that the police had control over evidence and failed to preserve it is insufficient, by itself, to establish bad faith, nor will bad faith be found in the government's negligent failure to preserve potentially exculpatory evidence."). What is missing here is any suggestion by the defense, let alone proof, of official animus toward any of the defendants or of a conscious effort to suppress exculpatory evidence. No proof was presented that the Property Clerk had any involvement in, connection to, or knowledge of the Santos murder investigation. No motive or reason was identified by the defense as to why the Property Clerk would even know that the evidence he released for auction had any evidentiary value, exculpatory or otherwise, let alone harbor ill will towards the moving defendants. The only reason identified at the hearing for the Property Clerk's insouciant decision to release the Santos evidence to auction was the Property Clerk's desire to "free up" shelf space in an overcrowded evidence locker. This is a motive that hardly implies

30

knowledge that the items at issue had an exculpatory value that was apparent to the Property Clerk before he released them for auction. See United States v. Rastelli, 870 F.2d 822, 833 (2d Cir. 1989)(no due process violation where "neither the missing tapes nor the bid documents contained exculpatory evidence that was apparent before they were lost"), cert. denied, 493 U.S. 982 (1989).

Perhaps recognizing an absence of proof demonstrating that the Property Clerk had any hostility towards the defendants or knowledge that the items he decided to discard had any potentially exculpatory value, the defendants argue that the Property Clerk's conduct cannot be viewed in isolation, but must be considered in tandem with the total lack of institutional oversight and protocols as to how evidence should be handled. According to the defense: "The policy deficiency and [the Property Clerk's] reckless conduct demonstrate objective bad faith sufficient to establish the bad faith requirement of the Trombetta/Youngblood test." See Defendants' Joint Memorandum of Law (Docket # 588) at p. 20.

In support of their "policy deficiency" argument, the defendants cite to a single case – United States v. Elliott, 83 F. Supp. 2d 637 (E.D. Va. 1999). In Elliott, the defendant was suspected of trafficking methamphetamine after a search of a vehicle the defendant's brother was driving discovered laboratory glassware, tubing, chemicals, plastic gloves, and filters. The glassware was transported to a DEA office, tested for the presence

of fingerprints and then the DEA agent immediately, and in direct contravention of established DEA protocols, ordered the tested items to be destroyed. Id. at 640. While the defendant's fingerprints were found on several pieces of glassware, other fingerprints not belonging to the defendant were also found on the glassware. Applying Youngblood, the court ruled that the destruction of the evidence was done in bad faith, since any "reasonable law enforcement agent" would recognize its potentially exculpatory value, including the possibility that testing could show that the residue on the glassware "was not that of methamphetamine or its chemical constituents." Id. at 643. The Court found that "[o]n this record then, it is beyond serious question that a reasonable law enforcement agent would recognize, before the glassware was destroyed, that it was of potentially exculpatory value." Id. Accordingly, the court suppressed the use of the fingerprint evidence at trial. Id. at 649.

Defendants here seek to persuade the Court that Elliott stands for the proposition that the lack of adequate protocols regarding the storage and disposal of evidence constitutes bad faith. See Defendants' Joint Memorandum of Law (Docket # 588) at p. 20. But there was much more to the holding in Elliott than the agent's failure to follow evidence preservation policies. As the Supreme Court held in Youngblood, a showing of bad faith "must necessarily turn on the police's knowledge of the exculpatory value of the

32

evidence <u>at the time it was lost or destroyed</u>." 488 U.S. at 56 n.*
(emphasis added). In <u>Elliott</u>, the offending DEA agent was an
active participant in the criminal investigation and hence was well
aware of the forensic tests that were conducted and their potential
importance. Despite that knowledge, the agent in <u>Elliott</u> ordered
that after the glassware was tested by the laboratory it should be
immediately destroyed thus ensuring that it could not be tested by
the defense for potentially exculpatory evidence. It was this
chain of events that prompted the court to find that the DEA
agent's defiance of evidence preservation protocols was reckless
because he <u>knew or should have known</u> that the test results could
yield potentially exculpatory evidence. Here, by contrast, the
Property Clerk was never actively involved in the Santos murder
investigation and had no knowledge of the tests that had been
conducted on some of the items that were destroyed. Moreover,
unlike <u>Elliott</u> where the decision to destroy the glassware was made
immediately after law enforcement testing, the Property Clerk's
decision to discard the Santos evidence was made after many years
of storage during which time the Property Clerk actually maintained
the evidence for safekeeping. These facts dispel any notion that
the Property Clerk knew anything about the evidentiary value of the
items or was making a conscious effort to suppress exculpatory
evidence. See <u>United States v. Vera</u>, 231 F. Supp. 2d 997 (D. Or.
2001)(despite "the serious mishandling" of evidence by the police,

33

Elliott case was "not controlling" and a more culpable mental state than even recklessness was required to demonstrate bad faith); see also United States v. Williams, No. 1:06-cr-011 DB, 2008 WL 7330249, at *8 (D. Utah Mar. 12, 2008)(distinguishing Elliott holding on its facts).   Finally, it is worth mentioning that the court in Elliott did not grant the defendant's motion to dismiss the indictment for a due process violation, but rather found the appropriate remedy to be "suppression of the evidence of the fingerprints."   83 F. Supp. 2d at 649.   In sum, the facts in Elliott were far different than the facts presented here and, contrary to the arguments made by the defendants, its holding is not an adequate substitute for proof demonstrating bad faith.

Two cases relied on by the Government are more persuasive.   In United States v. Garza, 435 F.3d 73 (1st Cir. 2006), the First Circuit affirmed the trial judge's denial of a motion to dismiss an indictment where a police sergeant made a "conscious and deliberate" decision to destroy potentially exculpatory evidence in an open drug case in order to "free up space in the laboratory." Two years later, the defendant was arrested and moved to dismiss the indictment arguing that the evidence was destroyed in bad faith."   Id. at 75.   The court held that even if the sergeant's decision to destroy the evidence was "'short-sighted and even negligent,' this does not satisfy the requirement of bad faith." Id. (citation omitted).

In <u>Story v. Martel</u>, No. 10-CV-00566, 2011 WL 90112 (N.D. Cal.
Jan. 10, 2011), the habeas petitioner was convicted in 2005 of a
murder that occurred over twenty-five years earlier.  During the
time period between the murder and the trial, all of the physical
evidence in the case had been lost or destroyed by law enforcement.
In a federal habeas proceeding, the petitioner argued that the loss
of all the physical evidence "constitutes a denial of due process
because the evidence would have played a significant role in his
defense, comparable evidence could not be obtained, and the loss
occurred due to bad faith on the part of the police."  <u>Id.</u> at *11.
A factual hearing demonstrated that the police department "lost or
destroyed every single piece of physical evidence obtained in the
case, and not a single Police Department employee who testified
could explain its disappearance."  <u>Id.</u>  In seeking habeas relief,
the petitioner argued that "the loss of all the physical evidence
in the case, without explanation and in violation of well-
established police department policy, must be considered to be in
bad faith."  <u>Id.</u>  In denying habeas relief, the court agreed with
the petitioner that while the unexplained and total loss of
evidence was "both perplexing and disturbing," it did not rise to
the level of bad faith.  <u>Id.</u>  More particularly, the court rejected
the petitioner's argument "that the unexplained loss or destruction
of evidence in contravention of official policy constitutes bad
faith as a matter of law."  <u>Id.</u> at *12.  The court held: "[B]ad

faith in the context of lost or destroyed evidence requires some
intent to withhold evidence that may have value to the defense and
does not turn on police compliance with evidence destruction
policies." Id.; see also United States v. Bakhtiar, 994 F.2d 970,
976 (2d Cir. 1993)(even though the government "handled the evidence
sloppily," the court declined to sanction the government "for
negligent loss of evidence"); Edmonds v. Purdy, No. 08 Civ. 8808,
2009 WL 483189, at *14 (S.D.N.Y. Feb. 26, 2009)(the police acted
negligently in failing to properly store the evidence, but their
"sloppy procedures" did not amount to bad faith); United States v.
Wilder, No. 2:05-CR-88-1, 2007 WL 2668884, at *6 (D. Vt. Sept. 6,
2007)(the police's "unreliable system of evidence preservation" and
"informal procedure" with respect to determining whether evidence
should be destroyed led to "troubling" errors and negligence by the
government, but "there is no evidence that the errors were made in
bad faith").

    All of the cases litigating the loss or destruction of
potentially exculpatory evidence pay tribute to the difficult
evidentiary hurdle the defense faces in proving bad faith. As one
commentator noted about Youngblood's bad faith requirement: "[W]hat
was initially hailed as an almost 'impossible' standard by critics
has almost proven to be just that. According to this author's
research, there are 1,675 published cases that have cited
Youngblood to date but only seven reported cases where bad faith

has been found." Teresa N. Chen, The Youngblood Success Stories: Overcoming the "Bad Faith" Destruction of Evidence Standard, 109 W. VA. L. REV. 421, 422 (2007)(internal footnote omitted). Here, the testimony of the Property Clerk demonstrated clearly negligent conduct and an astonishing lack of care over evidence that was relevant to an open homicide investigation. But the conduct did not meet the Youngblood standard. Accordingly, because the defendants here have failed to adduce proof of bad faith, their motion to dismiss Count 14 of the Indictment fails.[5]

Finally, the defendants argued in their joint brief that the most "appropriate remedy under the circumstances of this case is dismissal of Count 14" and "[a]nything less, including the alternative of entirely excluding all reference to the missing evidence and expert opinion, is patently inadequate." See Defendants' Joint Memorandum of Law (Docket # 588) at p. 23. However, without citing any law, the last sentence of their submission contains an alternative request: "Alternatively, the defense requests that the government be precluded from offering any

---

[5] In their original motion papers, the defendants also challenged the destruction of certain physical and drug evidence that was seized by members of the Rochester Police Department. At the fact-finding hearing, Kathleen Katerle, the RPD Property Room Supervisor, testified that the Rochester based evidence was destroyed in full compliance with established RPD protocols and procedures. In light of this testimony, defendants no longer challenge the destruction of the RPD evidence. See Defendants' Joint Memorandum of Law (Docket # 588) at p. 2 n.1. On November 17, 2014, defense counsel spoke with Court staff and confirmed that this aspect of the defendants' motion has been withdrawn.

testimony or proof or otherwise referencing the recovery, inspection, or examination of the physical evidence at issue." Id. at p. 24. To the extent the defense seeks to preclude evidence or testimony from being presented at trial, or have some alternative remedy formulated instead of dismissal of Count 14, this request is not properly before this Court. At this juncture of the prosecution, the Court has no knowledge of who the Government will call as a witness, what specific evidence, expert or otherwise, will be presented, what theory of defense will be presented, or whether a "missing evidence" jury charge will be appropriate. Moreover, the defense brief cites no cases on any alternative remedy and indeed argues the total inadequacy of any such alternative. Accordingly, unless the trial judge refers the matter to this Court for further briefing and consideration of alternative remedies, the issue of preclusion of trial evidence is better left to the trial judge after the Government has disclosed its fact and expert witness list and provided a proposed exhibit list. See United States v. Bakhtiar, 994 F.2d 970, 976 (2d Cir. 1993)(choice of sanctions for government loss of evidence "should be tailored to redress for any resulting harm to the defendant"); United States v. Eldridge, No. 1:09CR329A, Docket # 216 at p. 37 (W.D.N.Y. June 12, 2013)(after conducting an evidentiary hearing on the government's culpability for the loss of evidence, Magistrate Judge Scott recommended denial of motion to dismiss counts but "defers to the

District Judge" whether to impose alternative sanctions), adopted by No. 09-CR-329, 2013 WL 6096520 (W.D.N.Y. Nov. 20, 2013).

## Conclusion

For all of the foregoing reasons, it is my Report and Recommendation that defendants' motion to dismiss Count 14 of the Second Superceding Indictment on grounds of spoliation of evidence be **denied.**

SO **ORDERED.**

JONATHAN W. FELDMAN
United States Magistrate Judge

Dated: February 10, 2015
       Rochester, New York

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York.[6]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Patterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections ... shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b)(2) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

    **SO ORDERED.**

                                           _____
                                          Jonathan W. Feldman
                                          United States Magistrate Judge

Dated:    February 10, 2015
            Rochester, New York

---

[6]    Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. United States v. Andress, 943 F.2d 622 (6th Cir. 1991); United States v. Long, 900 F.2d 1270 (8th Cir. 1990).