UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                                 Plaintiff,

                                                         Case #10-CR-6096-FPG

v.

                                                     DECISION & ORDER

JAMES KENDRICK,
PABLO PLAZA (DOB 1972),
JANINE PLAZA PIERCE, and
ANGELO CRUZ,

                                 Defendants.
_____

      By Text Orders of Hon. Charles J. Siragusa, entered on July 8, 2010 and March 1, 2011, this case was referred to United States Magistrate Judge Jonathan W. Feldman, pursuant to 28 U.S.C. § 636(b)(1)(A)-(B).   ECF Nos. 17, 75.   As part of a Second Superseding Indictment involving multiple defendants and alleging a drug conspiracy occurring from 1993 through March 2, 2011 (ECF No. 268), Defendant James Kendrick has been charged with Counts 1-10, 14 and 15 (to wit: Narcotics Conspiracy in violation of 21 U.S.C. § 846; Continuing Criminal Enterprise in violation of 21 U.S.C. § 848(a); Attempted Possession of Heroin with Intent to Distribute in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2; two counts of Possession of Heroin with Intent to Distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A), and 18 U.S.C. § 2; two counts of Using Premises for Drug Dealing in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2; two counts of Possession of Firearm in Furtherance of Drug Crimes in violation of 18 U.S.C. §§ 924(c)(1) and 2; Possession and Discharge of Firearms in Furtherance of Drug Crime in violation of 18 U.S.C. §§ 924(c)(1)(a)(iii) and 2; and two counts of Murder While Engaged in Drug Crime in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2); Defendant Pablo Plaza

(DOB 1972) has been charged with Counts 1, 4-11 and 14 (to wit: Narcotics Conspiracy in violation of 21 U.S.C. § 846; two counts of Possession of Heroin with Intent to Distribute in violation of  21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A), and 18 U.S.C. § 2; two counts of Using Premises for Drug Dealing in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2; two counts of Possession of Firearm in Furtherance of Drug Crimes in violation of 18 U.S.C. §§ 924(c)(1) and 2; Possession and Discharge of Firearms in Furtherance of Drug Crime in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 2; Possession of Cocaine with Intent to Distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and 18 U.S.C. § 2; and Murder While Engaged in Drug Crime in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2); Defendant Janine Plaza Pierce has been charged with Counts 1, 10 and 14 (to wit: Narcotics Conspiracy in violation of 21 U.S.C. § 846; Possession and Discharge of Firearms in Furtherance of Drug Crime in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 2; and Murder While Engaged in Drug Crime in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2); and Defendant Angelo Cruz has been charged with Counts 1 and 14 (to wit: Narcotics Conspiracy in violation of 21 U.S.C. § 846 and Murder While Engaged in Drug Crime in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2).

Defendants filed Joint Pre-Trial Motions (ECF No. 365), the government filed papers in opposition to these motions (ECF No. 444), and the parties filed supplemental papers regarding these motions (ECF Nos. 449, 588, 598, 608).  A suppression hearing was held on April 2, 2014 (ECF No. 574), following which the Magistrate Judge reserved decision.  The instant Amended Report and Recommendation, filed on February 10, 2015 (ECF No. 649),[1] recommends that this Court deny Defendants' various motions seeking to dismiss Count 14 of the Second Superseding Indictment.

---

[1] The Magistrate Judge originally filed a Report and Recommendation on January 27, 2015.

On March 10, 2015, Defendants Kendrick and Plaza Pierce filed their Objection to the Magistrate Judge's Amended Report and Recommendation Concerning Defendants' Motion to Dismiss Count 14 on the Grounds of Spoliation of Evidence ("Kendrick/Plaza Pierce Objection").   ECF No. 657.   On the same date, Defendant Cruz filed his Objection to the Magistrate Judge's Amended Report and Recommendation Concerning Defendants' Motion to Dismiss Count 14 on the Grounds of Spoliation of Evidence ("Cruz Objection"), joining in the Objections filed by Defendants Kendrick and Plaza Pierce.  ECF No. 658.  On March 30, 2015, the government timely filed the Government's Memorandum in Opposition to Defendants' Objections to Judge Feldman's Amended Report and Recommendation Denying Defendants' Motion to Dismiss on Basis of Spoliation of Evidence ("Gov't Mem.").  ECF No. 661.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Magistrate Judge's Amended Report and Recommendation to which objections have been made.  Under this provision, "[a] judge may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id*.  Upon a *de novo* review of the Amended Report and Recommendation, and a review of Defendants' Objections to the Magistrate Judge's Amended Report and Recommendation, the Government's Memorandum in Opposition to the Defendants' Objections, the certified transcript of the suppression hearing held on April 2, 2014,[2] the written submissions of the parties, as well as their motion papers, I find no basis to alter, modify, or reject the Magistrate Judge's Amended Report and Recommendation.

No Objections to the Magistrate Judge's Amended Report and Recommendation have been filed by, or on behalf of Defendant Plaza (DOB '72).  As to Defendant Plaza (DOB '72), upon reviewing all matters submitted, I find no basis to alter, modify, or reject any of the findings and conclusions set forth in the Amended Report and Recommendation.  The Magistrate

---

[2] The certified transcript of the suppression hearing proceedings is herein referred to as ("Tr."), along with the associated page number(s).

Judge's recommendation to deny his motion to dismiss Count 14 on the ground of spoliation of evidence, as set forth herein below with respect to the Objections filed by Defendants Kendrick, Plaza Pierce, and Cruz, reflects a well-reasoned analysis of the facts and application of the relevant law.

Preliminarily, on May 17, 1999, members of the Erie County Sheriff's Office investigated a shallow grave found on the Cattaraugus Indian Reservation in Collins, New York, with what appeared to be a leg sticking partly out of the grave. The Erie County Medical Examiner conducted an autopsy on the body. The autopsied body was identified as that of Francisco Santos whose death was "caused by multiple stab wounds." Potential evidentiary items removed from the gravesite included clothing, boots, a Rochester Transit System bus token, and a New York State photo ID card issued in the name of the decedent; a pair of sunglasses was found hanging on a nearby tree. Other items collected from various other locations during the course of the murder investigation from 1999-2009, included, *inter alia*, several knives, clothing, hair samples, a shovel with a broken handle and soil residue, glass liquor bottle, and seven steak knives. On June 8, 2000, a serrated steak knife blade was found buried in the area of the shallow grave. With the exception of the clothing and boots, which were disposed of by the medical examiner after the autopsy, all other items were received by the Erie County Sheriff's Office and logged into its property room for safekeeping. During discovery, following the Second Superseding Indictment, defense counsel sought to examine the physical evidence related to the Santos murder, but were informed by the government in 2012 that the Erie County Sheriff's Office could not locate any of the physical evidence from the Santos murder investigation. An evidentiary hearing to determine the facts and circumstances surrounding the loss and destruction of evidence was conducted by the Magistrate Judge who set

forth his findings and conclusions in the resulting Amended Report and Recommendation, a portion of which is the subject of the Defendants' Objections.

I turn, now, to the Objections filed by Defendants Kendrick, Plaza Pierce and Cruz which focus on the alleged error of the Magistrate Judge in determining that the Property Clerk of the Erie County Sheriff's Office did not act in bad faith when, in 2002, he mistakenly sent some of the items which were collected during the investigation of the murder of Francisco Santos to be auctioned before the defense had an opportunity to review them. All parties acknowledge the Magistrate Judge's accurate description of the facts adduced at the hearing as they pertain to the Property Clerk. Yet, I find a recap of the testimony of the Property Clerk as set forth in the Amended Report and Recommendation to be very helpful before proceeding to discuss Defendants' Objections:

> The retired Erie County Sheriff's Office employee who worked as the Sheriff's Office Property Clerk also testified at the hearing. This Property Clerk worked for the Erie County Sheriff's Office for approximately thirty years, [serving as Property Clerk] from approximately 1997 through 2003. Tr. at 86-87. According to the Property Clerk, his responsibilities included "[m]aintaining the evidence, logging it into the property room and keeping it secure until whomever wanted it." Tr. at 87. The Property Clerk explained that whenever evidence was removed from the property room it had to be "signed for." Tr. at 89.
>
> The Property Clerk's testimony centered on his description of the procedures he used in deciding if and when to dispose, abandon, or destroy evidence maintained in the property room. According to the Property Clerk, the property room was "very small" and "we had to constantly eliminate" evidence from the room. Tr. at 90. The Property Clerk testified that "the amount of physical space in the [property] room" required him to periodically survey the evidence in the property room in order to decide what evidence to dispose of or abandon. Tr. at 101. Put simply, when the Property Clerk was "running out of space" to store evidence he would decide what evidence to dispose of. Tr. at 101. The Property Clerk testified that once he determined what evidence would be removed from the property room, the "past practice" of the Sheriff's Office was to give it to an auction company. Tr. at 89. The

auctioneer "would come in a truck and take anything that we wanted to get rid of, and if it was of value, they would auction it off. If it was of no value, they would throw it away." Tr. at 89. The Property Clerk stated that from time to time evidence was auctioned off because "[s]ometimes if the statute of limitations were over, I would ask the captain and he would approve for me to get rid of something." Tr. at 102-103. The Property Clerk further explained that "sometimes if I looked at something and it's been on there for a long time, I would dispose of it depending on its age, I would get rid of it just for the fact that it's been there for fifteen years." Tr. at 104. The Property Clerk testified that he had the discretion to dispose of items in the property room without consulting with a supervisor. Tr. at 107.

The Property Clerk testified that on April 16, 2002, he approved sending to auction all of the physical evidence in the Santos murder case that was stored in the property room. Tr. at 93-94. The Property Clerk did not review what specifically in the Santos file was being disposed of as it was the "practice" for "everything" in a case to be sent off to auction once a determination had been made to dispose of evidence on that case. Tr. at 95. The Property Clerk himself did not discard any items of evidence, rather he followed past practice and requested that the auctioneer come and pick up evidence to be discarded, which included the Santos evidence. Tr. at 95. The Property Clerk explained that the auctioneer would decide whether items were sold or discarded. Tr. at 95.

The Property Clerk readily admitted that evidence in an open homicide investigation should never have been sent to auction. Tr. at 96. While he had no specific recollection of the evidence he was maintaining in the Santos case, he surmised that he must not have realized that Santos was a homicide case. Tr. at 90. According to the Property Clerk, if he had realized the property he was discarding was related to a murder investigation, he never would have released the evidence for auction. Tr. at 90. The Property Clerk repeatedly described his actions as a "mistake." The Property Clerk testified that every item of property is assigned a "lot number" which corresponds to the number on the property receipt. Tr. at 96. The property receipt form requires a case type designation. The words "homicide" or "murder" are clearly written at the top of the relevant receipt forms for the Santos property. *See* Hearing Exhibits "5" and "6." The Property Clerk stated that every property receipt for evidence in the storage room is physically bound together by a clip located at the top of the receipts. Tr. at 91. Because there were so many receipts, it was "difficult" to lift each page so as to be able to read what is written at the top of the form "without pulling apart the

book" of forms. Tr. at 91.  Asked directly to "recall any steps
you took before making that decision to give it to the
auctioneer," the Property Clerk responded:

> I didn't really, it was given to him by mistake. I
> needed shelf space. I looked at the [property]
> bags to see if []there was anything of value in there,
> that I thought as of any value, and I mistakenly
> gave them away without looking at the top of the
> thing [receipt form] and seeing it was for a
> homicide investigation. Tr. at 108-109.

The Property Clerk also testified that in deciding whether stored
evidence related to an open or closed case, he also "could look it up
on the computer." Tr. at 110.  When asked by the Court "how
could you make a mistake like not looking it up on the
computer?", the Property Clerk replied:

> I can give you that going through this when I'm
> looking for things, I can get rid of boxes from DWI,
> old things I know are trespassing cases.  In the
> process of doing that I could have misread the
> number.  I could have done that, could have flipped
> back on me and I went back and removed that stuff
> and removed by mistake.  It never should have
> gone.  I can't tell you exactly how I did it, but I
> know I made a mistake and pulled it off the shelf
> and got rid of it.  Tr. at 111.

The Property Clerk admitted that he did not check with a
supervisor, the District Attorney's Office, the United States
Attorney's Office, or anyone else, before discarding the Santos
evidence stored in the property room.  Tr. at 119-120.  Indeed,
he did not realize his error until years later when he was
contacted by the United States Attorney's Office about the
missing evidence.  Tr. at 120.  However, the Property Clerk
insisted that in allowing the Santos evidence to be released for
auction, he never "intended to conceal or hide any exculpatory
material" or "to somehow undermine a murder investigation or
the ability" of any of the defendants to defend themselves
against one.  Tr. at 97.

ECF No. 649, at 14-18.

Defendants emphasize that the Magistrate Judge commented that he found the lack of

care taken by the now retired Property Clerk over the Santos murder investigation evidence to be

"nothing short of astonishing"; there was no "rational excuse or coherent explanation for mindlessly releasing for auction evidence relevant to an unsolved murder investigation simply because the evidence room was getting too crowded"; and it was "even more remarkable" that the decision to discard the items "was made by a public employee whose primary job responsibility was to maintain a secure storage room so that relevant evidence needed by law enforcement would be available for later use and analysis." ECF No. 649, at 19. They contend that by applying the standard articulated by the Supreme Court in *California v. Trombetta*, 467 U.S. 479 (1984) and *Arizona v. Youngblood*, 488 U.S. 51 (1988), the Magistrate Judge reached an erroneous conclusion that absent a showing of bad faith, the police actions in this case did not rise to the level of a due process violation. Specifically, by requiring "proof of official animus toward any defendant or… a conscious effort to suppress exculpatory evidence," to satisfy the bad faith requirement,  Defendants argue, the Magistrate Judge held them to a higher standard than either the Supreme Court or the Second Circuit has required for motions seeking dismissal based on spoliation of evidence. Defendants urge this Court, instead, to adopt the standard articulated in *United States v. Elliott*, 83 F. Supp. 2d 637 (E.D. Va. 1999), which they argue held that "bad faith exists when conduct is knowingly engaged in or where it is reckless." *Id.* at 650-51.

Initially, as the Magistrate Judge emphasized, it is beyond cavil that the due process rights of a criminal defendant include the right to review all evidence in the government's possession that "is material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). In circumstances involving the State's failure to disclose material exculpatory evidence, "the good or bad faith of the prosecution is irrelevant: a due process violation occurs whenever such evidence is withheld." *Illinois v. Fisher*, 540 U.S. 544, 547 (2004) (citing *Brady*, 373 U.S. at 87); *Trombetta*, 467 U.S. at 485.

The *Youngblood* Court, however, distinguished circumstances involving the failure of the government to preserve evidence of indeterminate exculpatory value or only potentially useful to the defendant, *i.e.*, "the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant."  *Youngblood*, 488 U.S. at 57.  Under this test, a defendant must show that (1) the government acted in bad faith in failing to preserve the evidence; (2) the exculpatory value of the evidence was apparent before its destruction; and (3) the evidence is irreplaceable and the defendant would not be able to obtain comparable evidence by other reasonable means.  *See Youngblood*, 488 U.S. at 57-58; *Trombetta*, 467 U.S. at 488.  Thus, the *Youngblood* Court held that "unless a criminal defendant can show bad faith on the part of the police, the failure to preserve potentially useful evidence does not constitute a denial of due process."  *Id.* at 58.

Here, by conceding that their spoliation concerns related only to the "potentially exculpatory" nature of any evidence which may have been disclosed had these items been tested by the defense before being lost or destroyed, Defendants acknowledged that the burden of showing bad faith on the part of police rested with them.  Implicit in this acknowledgment, then, should be an understanding of the important rationale underpinning the *Youngblood* holding:

> [R]equiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant.* (Emphasis added.)

*Id.*

I find that the Magistrate Judge placed no greater onus on Defendants to show bad faith. Contrary to the Defendants' position, the Magistrate Judge applied the correct standard in evaluating whether the loss or destruction of the "potentially exculpatory" evidence in this case

met the requisite test of bad faith on the part of law enforcement.  The Supreme Court has equated bad faith with a "calculated effort to circumvent the disclosure requirements established by *Brady v. Maryland* and its progeny," stating that the record contained no allegation of "official animus … or of a conscious effort to suppress exculpatory evidence."  *Trombetta*, 467 U.S. at 488.  And, as the Magistrate Judge observed, other courts have followed the Supreme Court's lead in describing the defense burden of proof respecting the bad faith requirement.  *See, e.g., United States v. Jobson*, 102 F.3d 214 (6th Cir. 1996) ("official animus" or a "conscious effort to suppress exculpatory evidence"); *Ewing v. Zavislak*, 172 F.3d 872, 1998 WL 964238, at *1 (6th Cir. Dec. 30, 1998) ("a conscious effort to suppress exculpatory evidence"); *Woodson v. Sec'y, Dep't of Corrs.*, No. 6:10-cv-649-Orl-36KRS, 2012 WL 5199614, at *7 (M.D. Fla. Oct. 22, 2012) (awareness of the exculpatory nature of the evidence and a "conscious effort to prevent the defense from securing the evidence"); *United States v. Sanders*, 2017 F. App'x 651, 653 (7th Cir. 2006) (a "conscious effort to suppress exculpatory evidence"); *United States v. Garza*, 435 F.3d 73, 75 (1st Cir. 2006) (independent evidence of improper motivation); *Story v. Martel*, No. 10-CV-0056-LHK, 2011 WL 90112, at *12 (N.D. Cal. Jan. 10, 2011) ("intent to withhold evidence that may have value to the defense").  Furthermore, the *Youngblood* Court noted, "[t]he presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed."  *Youngblood*, 488 U.S. at 56 n.*.

For their part, Defendants eschew the more stringent definition of bad faith which the Magistrate Judge found to be supported by the weight of case law in this area and, instead, favor the holding in *Elliott*, the lone case cited by Defendants, as standing for the proposition that a showing of recklessness on the part of police in failing to follow established protocols for the

preservation of potentially useful evidence sufficed for bad faith.   I find the Defendants'
contentions regarding the applicability of the *Elliott* holding to be unpersuasive.

The facts in *Elliott* are instructive.   There, during an investigation of the defendant and
his brother by the Drug Enforcement Administration ("DEA") and local law enforcement
authorities for the manufacture of methamphetamine, glassware, some of which contained
smeared residue, along with other items suspected as being used in the making of
methamphetamine, were seized following a search of a vehicle belonging to defendant's brother;
the glassware was transported to the DEA Office and subjected to fingerprint analysis.   A DEA
Agent, actively participating in the criminal investigation, in direct contravention of established
DEA protocols, immediately ordered that the tested items be destroyed.   Fingerprint analysis of
the glassware yielded identifiable fingerprints belonging to defendant and other fingerprints
belonging to someone other than the defendant.

The court in *Elliott* purported to utilize the *Trombetta/Youngblood* standard in
determining    that (1) the DEA Agent reasonably should have recognized the potential
exculpatory value of the glassware before it was destroyed; (2) no alternative existed because
"only the physical item of evidence itself would enable the defendant to use the exculpatory
potential of the destroyed evidence"; and (3) the DEA Agent acted in bad faith when he
"authorized the destruction of valuable evidence within hours of its seizure, based on his
unsubstantiated assumption that the items were contaminated, and without first conferring with a
chemist and in contradiction to rather plainly worded regulations requiring the preservation of
evidence for due process purposes."  *Elliott*, 83 F.  Supp. 2d at 647.   The court went on to state
that:

> Where, as here, there is no evidence of an established practice
> which was relied upon to effectuate the destruction, where the
> applicable documents teach that destruction should not have
> occurred, and where the law enforcement officer acted in a manner

> which was either contrary to applicable policies and the common
> sense assessments of evidence reasonably to be expected of law
> enforcement officers or was so unmindful of both as to constitute
> the reckless disregard of both, there is a showing of objective bad
> faith sufficient to establish the bad faith requirement of the
> *Trombetta*/*Youngblood* test.

*Id.* at 647-48.

I find, as did the Magistrate Judge, that to the extent that *Elliott* stands for the proposition that a *mens rea* of no greater magnitude than recklessness is required to demonstrate bad faith, it stands alone.  *See*, *e.g., United States v. Vera,* 231 F. Supp. 2d 997 (D. Or. 2001) (distinguishing *Elliott* as not controlling, and stating that a more culpable mental state than recklessness was required to demonstrate bad faith).  The government, likewise, observes that *Elliott*'s lower standard for bad faith has not been adopted by any federal court, not to mention in the Second Circuit.  The Magistrate Judge committed no error by distinguishing *Elliott* and by not applying a lesser standard for establishing bad faith than constitutionally required under the *Trombetta*/*Youngblood* standard.

Consequently, I concur with the Magistrate Judge's conclusion that Defendants failed to sustain their burden at the hearing of showing official animus or a conscious effort to suppress exculpatory evidence on the part of the Property Clerk. Upon review of the Property Clerk's testimony, clearly absent is any demonstration that, before sending the items for auction, he was involved in, or connected in any way to the Santos murder investigation.  Indeed, he testified that he had no knowledge of the investigation and did not realize his error until contacted years later by the United States Attorney General about the missing evidence.  As the Magistrate Judge aptly concluded, the defense identified "[n]o motive or reason … as to why the Property Clerk would even know that the evidence he released for auction had any evidentiary value, exculpatory or otherwise, let alone harbor ill will towards [them]."  I find that nothing presented at the hearing contradicted the Property Clerk's statements that, without knowing their

evidentiary value, he mistakenly released the items for auction, and did not intend "to conceal or hide any exculpatory material or to somehow undermine a murder investigation or the ability of the any of the defendants to defend themselves against one."  Standing un-contradicted also is the Property Clerk's testimony that had he realized that such items were part of a homicide case, he never would have released them for auction.  As the Magistrate Judge surmised, attendant to "the Property Clerk's insouciant decision to release the Santos evidence to auction [in his] desire to 'free up' shelf space in an overcrowded evidence locker," there was no motive implying knowledge that the items had exculpatory values that was apparent to the Property Clerk before he released them for auction.  ECF No. 649, at 30-31.

In these circumstances, I conclude that the government's characterization of the Property Clerk's conduct in failing to preserve the evidence at issue as negligent or perhaps grossly negligent and not amounting to bad faith has merit.  Apparently, Defendants do not deny that negligent or grossly negligent conduct by law enforcement in failing to preserve potentially useful or potentially exculpatory evidence does not qualify as bad faith.

Significantly, Defendants have not cited any cases or provided any authority requiring this Court to consider whether the Property Clerk's negligence or gross negligence, in combination with the alleged absence of an Erie County Sheriff's Office "system" for maintaining and preserving potentially useful or potentially exculpatory evidence, amounts to bad faith.  Certainly, the *Elliott* decision which stressed the DEA Agent's disregard of longstanding policies and procedures for preserving evidence does not stand for such proposition.  It is noteworthy that even while finding the failure to follow established procedures to be probative evidence of bad faith, "particularly when the procedures are clear and unambiguous," the *Elliott* court acknowledged that "[o]rdinarily, the negligent destruction of evidence occasioned by the failure to comply with controlling authority will not give rise to a

finding of bad faith." *Elliott*, 83 F. Supp. 2d at 647.  For the reasons set forth herein above, the Objections cannot be sustained.

Thus, the Magistrate Judge's recommendation to deny the Defendants' Joint Pre-Trial Motion to dismiss Count 14 of the Second Superseding Indictment reflects a well-reasoned analysis of facts and application of the relevant law.  Accordingly, the Court accepts and adopts the Amended Report and Recommendation filed by United States Magistrate Judge Jonathan W. Feldman.  ECF No. 649.  As set forth herein above, Defendants' Joint Pre-Trial Motion to dismiss Count 14 of the Second Superseding Indictment on the ground of spoliation of evidence (ECF No. 365) is hereby denied in all respects.

IT IS SO ORDERED.

Dated:  April 29, 2015
          Rochester, New York


                                        s/Frank P. Geraci, Jr.
                                        HON. FRANK P. GERACI, JR.
                                        Chief Judge
                                        United States District Court