UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                                     Plaintiff,

                                                        Case #10-CR-6096-FPG

v.

                                                        DECISION & ORDER

JAMES KENDRICK,

                                     Defendant.

---

## BACKGROUND

By Text Orders of Hon. Charles J. Siragusa, entered on July 8, 2010 and March 1, 2011, this case was referred to United States Magistrate Judge Jonathan W. Feldman, pursuant to 28 U.S.C. § 636(b)(1)(A)-(B).  ECF Nos. 17, 75.  As part of a Second Superseding Indictment involving multiple defendants and alleging a drug conspiracy occurring from 1993 through March 2, 2011 (ECF No. 268), Defendant James Kendrick has been charged with Counts 1-10, 14 and 15, to wit: Narcotics Conspiracy in violation of 21 U.S.C. § 846; Continuing Criminal Enterprise in violation of 21 U.S.C. § 848(a); Attempted Possession of Heroin with Intent to Distribute in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2; two counts of Possession of Heroin with Intent to Distribute in violation of  21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A), and 18 U.S.C. § 2; two counts of Using Premises for Drug Dealing in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2; two counts of Possession of Firearm in Furtherance of Drug Crimes in violation of 18 U.S.C. §§ 924(c)(1) and 2; Possession and Discharge of Firearms in Furtherance of Drug Crime in violation of 18 U.S.C. §§ 924(c)(1)(a)(iii) and 2; and two counts of Murder While Engaged in Drug Crime in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2.

Defendant filed a pretrial motion to suppress (ECF No. 25), and the government filed papers in opposition to this motion (ECF No. 30). A suppression hearing was held on July 30, 2012 (ECF No. 299), and arguments were heard from by parties. Following the suppression hearing, both parties filed supplemental briefs. ECF Nos. 451, 453. The Magistrate Judge filed a Report and Recommendation on February 3, 2015. ECF No. 643. Therein, the Magistrate Judge recommends that this Court deny Defendant's motion to suppress evidence seized and statements he gave to law enforcement on October 2, 2009.

On March 10, 2015, Defendant filed his Objection to the Magistrate Judge's Report and Recommendation Concerning James Kendrick's Motion to Suppress ("Defendant.'s Objs."), on the ground that the traffic stop was unlawful and, therefore, all evidence obtained as a result of the stop, including drug evidence found during the search of the car and his post-arrest statements to police, must be suppressed. ECF No. 656. Thereafter, on March 30, 2015, the government timely filed its Memorandum in Opposition to James Kendrick's Objections to Judge Feldman's Report and Recommendation Denying His Motion to Suppress ("Gov't Resp."), contending that the Magistrate Judge's recommendation to deny suppression of evidence and statements was correct because the initial stop was supported by probable cause that Defendant was speeding, the subsequent period of detention was reasonable given the circumstances and the behavior of the driver and the passengers, and the Defendant was properly advised of his *Miranda* rights and knowingly waived them before talking to the police. ECF No. 662.

Following the issuance of the United States Supreme Court's decision in *Rodriguez v. United States*, 135 S. Ct. 1609, 2015 WL 1780927 (April 21, 2015), which held that absent reasonable suspicion, police extension of a traffic stop in order to conduct a dog sniff violates the

Fourth Amendment's prohibition against unreasonable searches, the government, by letter dated April 22, 2015, distinguished the facts in the instant matter from those presented in *Rodriguez* and urged this Court to find, as did the Magistrate Judge herein, that reasonable suspicion supported prolongation of the stop in this case. ECF No. 668. The Court provided Defendant with an opportunity to respond to the government's submission, and his timely response has now been received. ECF No. 675. Defendant has taken the position that *Rodriguez* further supports his position that the traffic stop in this case was unlawfully prolonged and the fruits of that stop must therefore be suppressed. *Id.*

## DISCUSSION

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Magistrate Judge's Report and Recommendation to which objections have been made. Under this provision, "[a] judge may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id.* Upon a *de novo* review of the Report and Recommendation, and a due consideration of Defendant's Objections to the Magistrate Judge's Report and Recommendation, the government's Memorandum in Opposition to the Defendant's Objections, the certified transcript of the motion hearing held on July 30, 2012,[1] all written submissions of the parties, as well as their motion papers, I find no basis to alter, modify, or reject the Magistrate Judge's Report and Recommendation.

Preliminarily, Defendant states that the relevant facts are set forth in the Magistrate Judge's Report and Recommendation. Upon review of the certified transcript of the suppression hearing, I concur with the Defendant's assessment regarding the accuracy of the Magistrate

---

[1] The certified transcript of the suppression hearing proceedings (ECF No. 299) is herein-after referred to by the abbreviation "Tr." with the accompanying page number(s).

Judge's reporting of the relevant facts adduced at the hearing.  A summary of the relevant facts proves helpful.

On October 2, 2009, at 10:03 A.M., New York State Trooper Gabriel T. Ryan stopped a Buick Rendezvous automobile on the New York Thruway for speeding as detected using a radar gun.  Tr. 32-34, 39-40.  At the time of the stop, Trooper Ryan radioed in the stop and gave the dispatcher the vehicle's license plate information and quickly learned that the car was registered to Jose Troche.  Tr. 66-67.  Trooper Ryan exited his vehicle, approached the passenger side of the Buick, and explained to the driver that he had stopped the car for speeding and asked him for his driver's license and registration.  Tr. 37.  The driver complied; Trooper Ryan identified him as Jose Troche.  *Id.*  Trooper Ryan described Troche as "shaking," "looking around," and "extremely nervous," and even after Trooper Ryan explained to Troche that he was just stopped for speeding, Troche still "didn't calm down at all."  Tr. 39.  According to Trooper Ryan, this distinguished Troche from other drivers.  *Id.*

Trooper Ryan asked Troche to step out of the car and accompany him to the back of the vehicle so he could ask him some questions; Troche did so.  *Id.*  Upon being asked where he was coming from and where he was going, Troche said that he had been at his Uncle Juan's house in Manhattan, that they went out to clubs after speaking with his uncle, and that he had spent the night at his uncle's residence.  Tr. 40-42.  Trooper Ryan observed that there "didn't appear to be anything in the vehicle for an overnight's stay."  Tr. 40.  He described Troche as "still extremely nervous."  Tr. 41.

After speaking with Troche, Trooper Ryan separately approached the two passengers, James Kendrick (front seat) and Jeffrey Davis (back seat), and asked them the "same questions" because it seemed like there was a little bit more going on than just staying overnight …there was no luggage in the vehicle."  *Id.*  Their answers differed: Kendrick and Davis told Trooper

Ryan that Troche's uncle's first name was Pablo and that they were driving from Brooklyn.  Tr. 42.  Kendrick told Trooper Ryan that they stayed in that evening; Davis told him that they went to different people's apartments that evening.  Tr. 42.  Trooper Ryan testified that "all three individuals were extremely nervous."  Tr. 70.

At 10:12 A.M., Trooper Ryan received information that Troche's license was valid, and he had sufficient information to issue him a speeding ticket.  Tr. 68.  Yet, based on his training, Trooper Ryan felt, "a little bit more was going on."  Tr. 70.  Again, he approached Troche and explained that "the stories weren't adding up, that there [were] three different stories.  That it was one evening that they were down there, I got three different answers on what they did that evening."  Tr. 43.  After telling Troche that "it seemed like something more was going on than just going from point A and going to point B," Trooper Ryan asked Troche for consent to search the vehicle.  Tr. 43-44.  Troche consented to the search and agreed to confirm consent by signing a written consent to search form.  Tr. 44-45.  Trooper Ryan retrieved the form and asked Troche to fill in his name and address.  Trooper Ryan filled in the vehicle information, and Troche signed the form at 10:24 A.M., following which Trooper Ryan conducted a search of the vehicle.  Tr. 47.  Trooper Ryan acknowledged that in the 11-minute period of detention for questioning between 10:13 and 10:24, Defendant was not free to leave.  Tr. 75.

During the search of the front passenger side of the vehicle, Trooper Ryan found "wedged in between the passenger seat and the center console" a yellow package which he secured in his vehicle.[2]  Tr. 48.  Upon being asked by Trooper Ryan if he knew what was in the

---

[2] The certified transcript of the hearing also contains testimony that upon discovering the yellow package, Trooper Ryan requested a K-9 to come to the scene to conduct a secondary search of the vehicle and "to see if the dog hits on the package."  Tr. 54-55.  Responding to such request, Lieutenant Temple of the Schenectady Sheriff's Department arrived at the scene at 11:06 A.M. and concluded that the yellow package contained heroin.  Tr. 57.  No issues regarding the timing or the sufficiency of any police procedures utilized during the canine search have been raised by

yellow package, Troche responded that "if he had to guess, he would guess it was either cocaine or heroin," and admitted that he was paid $500 to make the trip to the city. Tr. 49. Trooper Ryan then took Troche, Kendrick, and Davis into custody and placed all three in handcuffs. Tr. 49.

At 10:41 A.M., Trooper Ryan read Defendant his *Miranda* rights verbatim off a rights card carried in his pocket and asked him if he understood his rights; Defendant said that yes, he did. Tr. 51-52, 61. At no point did Defendant ask for a lawyer or say that he did not want to speak to police; he did not appear to be under the influence of drugs or alcohol. Tr. 53-54, 62. When asked by Trooper Ryan whether he would speak to law enforcement, Defendant responded that he wanted to speak with Troche and Davis. Tr. 52. When Trooper Ryan informed Defendant that was not going to happen, Defendant asked him "to pass a message to Jose [Troche]" and "tell him to pull a Javier." Tr. 53. Not understanding, Trooper Ryan later asked Troche what Defendant meant; Troche stated that Javier is his brother who was with Defendant when he was arrested and ended up "ratting out" Defendant. *Id.*

Defendant, Troche, and Davis were transported in separate vehicles to the Albany police station[3] where they were kept separate from one another. Defendant was initially questioned at the station by Investigator John Kelly who, beforehand, re-advised him of his *Miranda* rights by reading them verbatim off a rights card. Tr. 91. Defendant stated that he understood his rights and was willing to speak, but not to him — he wanted to speak "to a narcotics investigator." *Id.* Inv. Kelly contacted New York State Police Narcotics Investigator Daniel Kiley who agreed to come to the station to speak with Defendant. Tr. 92.

---

the Defendant. The Magistrate Judge did not address the dog sniff, and this Court will not undertake to do so in this decision.

[3] At the police station, Trooper Ryan conducted field tests of the contents of the yellow package which were positive for heroin. Tr. 60.

Upon his arrival at the police station a short time thereafter, Inv. Kiley first conferred with Trooper Ryan and Inv. Kelly regarding the arrests and status of the investigation, and was informed that Defendant had been advised of his *Miranda* rights. Tr. 103-04. Inv. Kiley then met with Defendant, who was handcuffed to a bull ring at the desk where he was seated, and began to interview him; he did not re-advise Defendant of his *Miranda* rights, however, informed the Defendant of his understanding that he had been Mirandized. *Id.* Inv. Kiley testified that during the approximately one-hour interview, Defendant was "[f]riendly, agreeable"; Defendant never asked to speak to a lawyer or said that he no longer wished to speak to the police. Tr. 104. Inv. Kiley further stated that he never threatened Defendant in any way, or denied any requests by Defendant to use the bathroom or to have food or water. Tr. 105, 112. Inv. Kiley did not make any promises to Defendant, but he did tell Defendant "what could potentially happen if he cooperated" — "things could maybe go easier with him." Tr. 109-10. Inv. Kiley stated that he also explained to Defendant that "maybe the prosecution would be lighter," but he "did not have that authority" and "[t]hat would have to come from the District Attorney's Office." *Id.*

The Magistrate Judge framed the elements of Defendant's arguments regarding the lawfulness of the traffic stop as follows: "The gravamen of Kendrick's argument is that while the stop of the car may have been lawful at its inception, the 21-minute delay between the traffic stop and the search of the Buick during which the narcotics were found was unreasonable under the Fourth Amendment." ECF No. 643. Under the facts and circumstances presented, and acknowledging the correctness of Defendant's assertion that law enforcement cannot unreasonably detain occupants of a car stopped solely for purposes of issuing a traffic ticket, the Magistrate Judge reached two conclusions: (1) the 21-minute delay between the traffic stop for speeding and the search of the Buick was reasonable since Trooper Ryan's questioning of the

occupants of the Buick did no measurably extend the duration of the stop; and (2) even if this 21-minute delay crossed the line of "reasonableness," extension of the traffic stop was justified because during the period he was issuing the ticket, Trooper Ryan obtained facts independent from the speeding violation which made the resulting delay reasonable under the Fourth Amendment.

In arriving at these conclusions, the Magistrate Judge reasoned that the Second Circuit's decision, *United States v. Harrison*, 606 F.3d 42 (2d Cir. 2010), correctly summarized the state of the law in this area:

> [E]ven a seizure that is "lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes,* 543 U.S. 405, 407 (2005). As applied to a traffic stop, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.* Still, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop ...do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson,* 555 U.S.  323, 333 (2009).

*Id.* at 45.  Observing that defendant Harrison, like Defendant Kendrick, argued that once the officer "had all of the information needed to issue the traffic ticket," he was required to issue the ticket and allow the driver to proceed without further inquiry or delay, the Magistrate Judge then went on to specifically highlight the Second Circuit's disagreement with this argument in *Harrison*:

> When a traffic stop is supported by probable cause, the occupants of the car have no "right to be released the instant the steps to check the license, registration, and outstanding warrants, and to write a ticket, had been completed ...[T]he Fourth Amendment does not require the release of a person arrested on probable cause at the earliest moment that step can be accomplished.  What the Constitution requires is that the entire process remain reasonable." *United States v. Childs*, 277 F.3d 947, 953-54 (7th Cir. 2002) (*in banc*).

*Id.*

Indicating his reliance on *Harrison* and noting that therein the Second Circuit cited with approval two out-of-circuit cases which found reasonable stops lasting appreciably longer than the five-to-six minute stop in *Harrison, i.e., United States v. Turvin*, 517 F.3d 1097, 1103-04 (9th Cir. 2008) (14-minute delay unrelated to the purpose of the stop found reasonable) and *United States v. Hernandez*, 418 F.3d 1206, 1212 n.7 (11th Cir. 2005) (expressing doubts that a 17-minute delay could ever be unconstitutional on account of its duration), the Magistrate Judge concluded that Trooper Ryan's questions did not measurably extend the duration of the stop.

The Magistrate Judge further found that even if Trooper Ryan's questioning "crossed the line of reasonableness" in prolonging the stop, the extended nature of the stop was nevertheless lawful because upon executing the stop, Trooper Ryan began acquiring facts independent of the speeding violation, giving rise to a reasonable suspicion that "criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968).  Pointing to Trooper Ryan's observations of conduct and information obtained from Troche, Defendant, and Davis, the Magistrate Judge recounted the occupants' unusually nervous behavior, failure to calm down, and inconsistent stories about their overnight travel which justified Trooper Ryan's suspicion that something more was going on than the speeding violation.  In so finding, he determined that the brief delay for Trooper Ryan to further investigate his suspicions was reasonable and did not violate Defendant's Fourth Amendment rights.

Turning now to the specific objections filed by Defendant Kendrick, I will refer to the relevant facts utilized by the Magistrate Judge, only as necessary to conduct the *de novo* review. Regarding Defendant's first contention that the Magistrate Judge erred in concluding that the stop was lawful, it is important to make clear that the Defendant does not contest the Magistrate

Judge's conclusions regarding the legality of the underlying initial stop of the Buick on October 2, 2009 for speeding, *i.e.*, 81 miles per hour, in excess of a 65 miles per hour speed limit, and that probable cause supported the initial stop.  ECF No. 656.  The stop for the vehicle for speeding was legitimate and, initially, Defendant was lawfully detained incident to the stop of the vehicle in which he was a passenger.  The issue here regards the reasonableness of Trooper Ryan's conduct in detaining the occupants of the vehicle following the execution of the stop.

To begin with, the Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  Because the "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision," *Whren v. United States*, 517 U.S. 806, 809-10 (1996), "an automobile stop is thus subject to the constitutional imperative that it not be unreasonable under the circumstances." *Id.* at 810.  "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citing *Katz v. United States*, 398 U.S. 347, 360 (1967)).  Thus, "[t]he central inquiry under the Fourth Amendment ...[is] reasonableness in all of the circumstances of the particular governmental invasion ...." *Terry,* 392 U.S. at 19.

Both parties have directed this Court's attention to *Rodriguez*, but for different reasons state its significance to resolving the Defendant's challenges to the Magistrate Judge's conclusions.  At the heart of the dispute in *Rodriguez* was the reasonableness of police conduct in relation to a traffic stop.  The Supreme Court, squarely presented in *Rodriguez* with the question of whether the Fourth Amendment tolerates a dog sniff conducted *after* the completion of a traffic stop, made clear its adherence to the line drawn in *Illinois v. Caballes*, 543 U.S. 405, 407 (2005), wherein it stated that "[a] seizure that is justified solely by the interest in issuing a

warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." 135 S. Ct. at 1612.

In *Caballes*, the Court held that a dog sniff conducted during a lawful traffic stop was permissible and did not violate the Fourth Amendment's prohibition against unreasonable seizures where no privacy interest was implicated and the duration of the stop was entirely justified by the traffic offense and the ordinary inquiries incident to such a stop. *Caballes*, 543 U.S. at 408-09. In *Rodriguez*, the Court answered in the negative the question of "whether police may routinely extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff," holding that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." 135 S. Ct. at 1612.

"*Terry* established the legitimacy of investigatory stops 'in situations where [the police] may lack probable cause for an arrest,'" where the stop is justified by a reasonably grounded suspicion that criminal activity may be afoot. *Johnson*, 555 U.S. at 330 (citing *Terry*, 392 U.S. at 24). In *Rodriguez*, reiterating that traffic stops are more akin to *Terry* stops than to formal arrests, the Supreme Court stated:

> A seizure for a traffic violation justifies a police investigation of that violation. "[A] relatively brief encounter," a routine traffic stop is "more analogous to a so-called '*Terry* stop'… than to a formal arrest." *Knowles v. Iowa*, 525 U.S. 113, 117, 119 S.Ct. 484, 142 L. Ed.2d 492 (1998) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L. Ed.2d 317 (1984) in turn citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L. Ed.2d 889 (1968)). *See also Arizona v. Johnson*, 555 U.S. 323, 330, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009). Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"—to address the traffic violation that warranted the stop, *Caballes*, 543 U.S., at 407, and attend any related safety concerns, *infra*, at 6-7. *See also United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L. Ed.2d 605 (1985); *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L. Ed. 229 (1983) (plurality opinion) ("The scope of the detention must be carefully

tailored to its underlying justification."). Because addressing the infraction is the purpose of the stop, it may "last no longer than is necessary to effectuate th[at] purpose." *Ibid. See also Caballes*, 543 U.S., at 407. Authority for the seizure thus ends when the tasks tied to the traffic infraction are—or reasonably should have been—completed. See *Sharpe*, 470 U.S., at 686 (in determining the reasonable duration of the stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation").

135 S. Ct. at 1614. The *Rodriguez* Court further stressed that while in both *Johnson* (questioning issue) and *Caballes* (dog sniff issue) it concluded that the "Fourth Amendment tolerated certain unrelated investigations that did not lengthen the roadside detention," it also cautioned in *Caballes*, and repeated this admonishment in *Johnson*, that a traffic stop could become unlawful if prolonged beyond the time reasonably required to complete the officer's mission. *Id.* at 1614-15 (citing *Johnson*, 555 U.S. at 327-28, 333; *Caballes*, 543 U.S. at 406, 407). This mission, *Rodriguez* stated, typically involves "ordinary inquiries incident to the [traffic stop]," *Caballes*, 543 U.S. at 408, such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 1615 (citing *Delaware v. Prouse*, 440 U.S. 648, 658-60 (1979)). Thus, while an officer may conduct certain unrelated checks during an otherwise lawful traffic stop, he may not, absent the reasonable suspicion ordinarily demanded to justify detaining an individual, do so in a way that prolongs the stop. *Id.*

*Rodriguez* contrasted the conduct of routine traffic measures directed at ensuring the safe and responsible operation of vehicles on the road, from the qualitatively distinct purpose of conducting a dog sniff, "a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" *Id.* at 1615-16 (quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 40-41 (2000); *see also Florida v. Jardines,* 569 U.S. 1, (2013) (slip op., at 7-8). Therefore, '[i]f an officer can complete the traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete [the stop's] mission.'" *Id.* at 1616 (quoting *Caballes*, 543 U.S.

at 407). "The critical question is not whether the dog sniff occurs before or after the officer issues a ticket …but whether conducting the dog sniff 'prolongs'—*i.e.*, adds time to—'the stop.'" *Id.*

The Supreme Court did not reach in *Rodriguez* the question left open by the Eighth Circuit's failure to review the Magistrate Judge's finding that the dog sniff was not independently supported by individualized suspicion. It remanded the case for consideration of whether reasonable suspicion of criminal activity justified detaining Rodriguez beyond completion of the traffic investigation. *Id.* at 1616-17.

This is not a dog sniff case as in *Rodriguez*, but rather one where the issue distills to whether Trooper Ryan's inquiries of the driver and passengers on matters unrelated to the traffic stop measurably extended the duration of stop so as to violate the Fourth Amendment proscription against unreasonable seizures. Analyzing the facts of the instant case under the *Rodriguez* framework, it is clear that at 10:12 A.M. on October 2, 2009, approximately nine minutes after stopping the Buick, Trooper Ryan had sufficient information to issue Troche, its driver, a ticket for speeding.[4] Moreover, it is clear, additionally, that Troche's signing of the written consent to search the vehicle occurred at 10:24 A.M. No question but that absent a reasonable suspicion of criminal activity, extending the stop beyond 10:12 A.M., coupled with a reasonably expeditious time period within which to actually prepare and issue the ticket, in order to conduct further questioning of the driver and the occupants about matters unrelated to the purpose of the traffic stop would appear to violate the clarified rule announced in *Rodriguez*.

As Defendant has acknowledged, "[a] traffic stop may be extended for investigatory purposes if an officer develops a reasonable suspicion of criminal activity supported by specific

---

[4] Missing from the hearing record is any testimony regarding the estimated length of time required to actually issue a speeding ticket. Additionally, nor does the hearing record disclose the time at which actual issuance of the speeding ticket occurred.

and articulable facts." *United States v. Foreste*, 780 F.3d 518, 523 (2d Cir. 2015) (citing *United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir. 1992)).  *Rodriguez* does not suggest otherwise to the contrary.

Accepting that "the concept of reasonable suspicion is not susceptible to precise definition," it is understood that "the requisite level of suspicion to make an investigatory stop 'is considerably less than proof of wrongdoing by a preponderance of the evidence,'" *United States v. Glover*, 957 F.2d at 1009-10 (quoting *United States v. Villegas*, 928 F.2d 512, 516 (2d Cir.) *cert. denied* 502 U.S. 843 (1991) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).  This standard is "not high," *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014), but more than an "inchoate and unparticularized suspicion" or mere "hunch" is required to justify a *Terry*-type detention.  *Terry*, 392 U.S. at 27.  The police officer must be able to point to specific and articulable facts which, taken together with rational inferences therefrom, warrant the intrusion. *Id.* at 21.

As a review of the instant facts demonstrates, however, the execution of the stop and obtaining information pursuant to the requested checks of Troche's license and registration did not occur in a vacuum, or proceed in a manner suggestive of the type of unlawful police conduct which the Supreme Court decried in *Rodriguez*.  The hearing record discloses, and the Magistrate Judge found, that from the moment he approached the passenger side of the vehicle and asked the driver for his license and registration, Trooper Ryan began making observations of the driver and the two passengers and obtaining information, independent of the speeding violation, which raised suspicion that "criminal activity may be afoot." *Terry*, 392 U.S. at 30.

Troche's extremely nervous behavior and failure to calm down after being told the reason for the stop caused Trooper Ryan to ask him to step out of the vehicle.  Once standing at the back of Troche's car, Trooper Ryan asked Troche basic questions about where he was coming from

and where he was going. Upon being informed by Troche that he had spent the night in Manhattan, Trooper Ryan, noting that there was no luggage in the vehicle, sought to make inquiry of the two passengers, who also were extremely nervous. Upon separate questioning, the two passengers gave accounts regarding with whom and where they had spent the night and their activities during their stay that differed in significant aspects not only with each other's, but also from the account provided by Troche. Only after Trooper Ryan made observations of their nervous behavior and failure to calm down upon being told that the vehicle had been stopped for speeding, the lack of luggage for an overnight trip to the New York City area, and noted the inconsistent stories about where they had been, who they had been with, and the activities during their stay, did he approach Troche, again, to explain that the stories did not add up and that it seemed like more was going on than just going from point A to point B and to ask him for permission to search the vehicle. At that point, Troche gave oral permission to Trooper Ryan, and later, at 10:24 A.M., signed the written consent to search form.

Arguing the absence of reasonable suspicion, Defendant declares that neither nervousness upon being stopped by police for speeding nor inconsistent stories of the driver and passengers about their travel and activities, constitute anything other than innocent or lawful behavior. Viewed in isolation, perhaps neither standing alone would support a finding of reasonable suspicion. But as the Supreme Court observed in *Sokolow*, "[i]ndeed, *Terry* itself involved 'a series of acts, each of them perhaps innocent' if viewed separately, 'but taken together warranted further investigation.'" *Sokolow*, 490 U.S. at 9-10. Such is the case here. Taken together with the rational inferences flowing therefrom and viewed objectively, Trooper Ryan's articulated independent observations, which commenced immediately upon his approach of the passenger side of the vehicle, and continued throughout the traffic stop, supported a reasonable suspicion that criminal activity was afoot, thereby, justifying further investigation. I

concur with the Magistrate Judge's conclusion that in these circumstances, the brief delay occasioned by Trooper Ryan's investigation was reasonable and did not unlawfully extend the traffic stop in violation of Defendant's Fourth Amendment rights.

Based upon the claimed unlawfulness of the stop, Defendant also contended that the drug evidence and his statements must be suppressed as the fruit of an illegal detention and due to an unpurged taint from such detention. The Magistrate Judge did not reach this contention or analyze the cases offered as support because he determined that Defendant was not illegally seized prior to the search of the vehicle and the discovery of the narcotics. I agree that given the lawfulness of the stop and detention, no reason existed to address this issue.

Finally, I find that the Magistrate Judge properly determined that suppression of the Defendant's un-coerced statements made while in custody at the scene and during the custodial interrogation at the police station was not warranted because he was properly advised of his *Miranda* rights, indicated that he understood these rights, and voluntarily waived them before speaking with the law enforcement. There is no evidence in the record from which to conclude that Defendant did not understand his rights, or that he invoked these rights, or that he only spoke with law enforcement under threat, undue pressure, or some other form of coercion. *Berghuis v. Thompkins*, 560 U.S. 370, 385 (2010) ("As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford."). Notably is there no claim by Defendant that his statements were the product of an involuntary relinquishment of his *Miranda* rights.

Thus, for the afore-stated reasons, the Magistrate Judge's recommendation to deny the Defendant's Motion to Suppress reflects an astute, well-reasoned analysis of the facts and application of the relevant law. Accordingly, the Court accepts and adopts the Report and

Recommendation filed by United States Magistrate Judge Jonathan W. Feldman.  ECF No. 643.

As set forth herein above, Defendant's motion to suppress the evidence seized as a result of the

traffic stop and his statements made on the day of his arrest (ECF No. 25) is hereby denied.

       IT IS SO ORDERED.

Dated: May 15, 2015
       Rochester, New York

                                    _____

                                      HON. FRANK P. GERACI, JR.
                                      Chief Judge
                                      United States District Court